In the Matter of the ESTATE of William PIERCE, Deceased.

No. 12785.

Supreme Court of South Dakota.

Argued Jan. 23, 1980.

Decided Dec. 23, 1980.

Michael L. Luce of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for contestant and appellant.

LeRoy S. Lassegard, Mitchell, for proponent and appellee.

Leonard E. Andera of Andera, Margadant & Erickson, Chamberlain, for beneficiaries and appellees.

GROSSHANS, Circuit Judge.

This is a will contest. The appeal follows the decision of the circuit court admitting the last will and testament of William Pierce to probate. We affirm.

William Pierce (decedent) passed away at a nursing home in White Lake, South Dakota, on December 4, 1978. He was eighty–nine years old. He had never married. Decedent was survived by his sister, Margaret Pierce, a nephew, Evan Jones, and a niece, Margaret Konechne, contestant and appellant herein.

Decedent and his sister, through natural family attrition over a period of fifty years, came into ownership of the bulk of their

father's property in Brule County, including additions by inheritance from other siblings. They were very close and in later years were constantly together. They had close ties to their land and, except for the final months of decedent's life, lived together on their farm land about four miles south of Kimball.

Decedent's last will and testament was executed on August 14, 1978, almost four months before decedent's death of uremia due to arteriosclerosis. This was the only will decedent ever executed. The instrument, insofar as is material to this decision, disposed of decedent's estate as follows: the sum of $1,000 to the Catholic Church for masses; the sum of $200 to contestant; and the remainder left in trust for the use and benefit of decedent's sister during her life. Upon his sister's death, the remaining corpus of the trust was to be distributed as follows: a section of land to the Catholic Church; a quarter section of land to one Ralph L. Geppert; a quarter section of land to one Merlin Chmela; a quarter section of land to one Henry Hartung; and any remainder thereafter to be divided equally between Mr. Chmela and Mr. Hartung. Decedent specifically excluded his nephew and niece except for the $200 bequest. The value of decedent's estate was approximately $306,000.

Decedent held a strong faith in the Catholic religion. Apparently this was consistent with his upbringing as his father, Nicholas, Sr., bequeathed a sum of money for masses in his will in 1928. Messrs. Geppert, Chmela and Hartung were friends, neighbors and tenants of decedent. Contestant admitted that she and decedent were not particularly close. The record is replete with evidence dating back over a quarter of a century that decedent was not particularly fond of contestant.

Contestant argues that it is the undue influence of Mr. Hartung that should cause the will to be set aside. Mr. Hartung first became acquainted with decedent in the late 1940's and became a tenant of decedent in 1950. Over the years, Mr. Hartung became a close friend and confidant of decedent. He provided business counsel and assisted decedent and his sister in many ways, especially in later years when they were unable to do many things for themselves. He hauled groceries, took them to church, took them to the doctor when necessary, cleaned their ashes, fixed their fences, hauled fuel and water and generally did whatever was necessary for their well-being. Eventually, Mr. Hartung was involved in handling decedent's financial affairs by way of writing out checks for the payment of his bills. He also paid decedent's property taxes.

Mr. Hartung rented a portion of decedent's land under an oral agreement requiring Mr. Hartung to pay as rent an amount equal to the real estate taxes. He did not pay the taxes, but each year gave decedent his check for the amount required. Decedent refused to accept the checks and tore them up. Another portion of decedent's land was rented on a tenant share–crop arrangement. Decedent took his share of the crop each year.

Around Memorial Day of 1978, a friend of the family visited decedent and his sister at their home. She reported her observations to contestant, who became concerned about their living arrangements. Decedent was blind. The home had no water or indoor plumbing. Food was lying around the house, and flies were prevalent. Contestant searched out a lawyer and had a petition prepared seeking letters of guardianship over the persons and estates of decedent and his sister. The petitions alleged decedent and his sister to be mentally incompetent.

On June 15, 1978, contestant found decedent lying on the porch of his home. His sister had stayed with friends for the evening. Apparently decedent had been there all night. His clothes were messed and he was unable to get up by himself. Decedent was taken to the hospital in Mitchell.

At this time Mr. Hartung became aware of contestant's petition. He eventually contacted an attorney in Mitchell for decedent and made arrangements for an interview at the hospital. At this interview, decedent made known his feelings about contestant and his suspicions of her motives. Needless

to say, he was upset. He felt that the guardianship action was being brought so that contestant could gain control of his property. At this interview, Mr. Hartung initiated an inquiry into what would happen to the decedent's property if he died intestate. Decedent made it known that he did not want contestant to receive any of his estate. Mr. Hartung advised that if this were the case, he could leave his estate "to the church or hospital or other organization." Mr. Hartung had been on the advisory council of the Catholic Church at Kimball for several years.

Decedent and his sister desired to have Mr. Hartung appointed guardian. On July 6, 1978, the circuit court, the Honorable Boyd McMurchie presiding, appointed Mr. Hartung and the First Mitchell National Bank as co–guardians on the basis of decedent's physical disabilities.

After letters of guardianship were issued, the Mitchell attorney continued to serve as the attorney for the guardianship. He also represented decedent and became the scrivener of the will at issue. When he became a witness at the trial, he properly withdrew from active participation in the case. The attorney arranged a meeting on August 10, 1978, at decedent's home with the co–guardians, the appraisers, and decedent and his sister. At this meeting, when the subject of wills came up, Mr. Hartung and the others absented themselves from the home. Margaret Pierce remained during the interview.

Decedent was primarily concerned about his sister. He wanted to assure that she would be taken care of. This concern was satisfied when the attorney explained the advantages of the trust. Decedent repeatedly stated that he did not want anything to go to contestant or his nephew. The attorney suggested that something should be left to contestant. Decedent finally agreed and decided upon the $200 bequest for contestant. He left nothing to his nephew because he had been gone since World War II, had not kept in touch, and did not need it. Decedent knew who his tenants were and generally which piece of real estate he wanted to leave to them.

Decedent had an appointment with his doctor in Mitchell set for August 14, 1978. The attorney made arrangements for the will to be executed on this occasion. All of the formalities requisite for the proper execution of a will were attendant on this occasion. Decedent's doctor was one of the witnesses to the will. He had treated decedent for about twelve years prior to the execution of the will. He testified that decedent was competent; he had his mind made up, knew exactly what he wanted, where he was, what was happening and how he wanted everything handled. The doctor testified that decedent had a will of iron and was not the type to be pushed very much.

The learned trial judge issued his memorandum opinion on March 14, 1979. Findings of fact and conclusions of law were signed on March 28, 1979. The findings and conclusions incorporated the memorandum opinion by reference. In its memorandum opinion, the trial court essentially found decedent to be mentally competent when the will was prepared and executed and that the attorney acted properly in all respects in his dealings with decedent. The trial court also found that a confidential relationship existed between decedent and Mr. Hartung, but that contestant had failed to carry her burden of proof as to Mr. Hartung's participation in the preparation of the will and as to whether he unduly profited from the will.

■■■■ In deciding this appeal, the appellate court is bound by the principle that the trial judge selects from the conflicting evidence that which he chooses to believe. He is the trier of fact. On appeal the prevailing party below is entitled to the benefit of the trial judge's version of the evidence and all favorable inferences fairly deducible therefrom. *In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970). This Court, by statute, is bound to apply the clearly erroneous test. SDCL 15–6–52(a). A finding is not clearly erroneous unless the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed by the

lower court. *In re Estate of Shabley*, 85 S.D. 692, 695, 189 N.W.2d 460, 461 (1971). All conflicts in the evidence must be resolved in favor of the trial court's findings. *In re Metz' Estate*, 78 S.D. 212, 214, 100 N.W.2d 393, 394 (1960). In conclusion, it is not our function to decide this case on the basis of what we would have done were we, individually, the trial judge.

█ The first issue to be addressed is that of undue influence. Influence to be undue in this case must be of such character as to destroy the free agency of decedent and substitute the will of Henry Hartung for that of decedent. *In re Metz' Estate*, supra.

█ Before discussing the requisite elements of undue influence, it must be remembered that the trial court found that a confidential relationship existed between decedent and Mr. Hartung. The existence of this relationship may require close judicial scrutiny. *In re Daly's Estate*, 59 S.D. 403, 407, 240 N.W. 342, 343 (1932). However, the mere existence of a confidential relationship does not, in and of itself, give rise to a presumption of undue influence. *In re Metz' Estate*, supra. It merely shifts the burden of going forward with the evidence, and, accordingly, Mr. Hartung must show that he took no unfair advantage of his dominant position.

The record reflects that once matters began to come to a head in mid–1978, Mr. Hartung contacted an attorney and made arrangements for an interview with decedent at the hospital. This is consistent with their relationship over the latter years of decedent's life and is understandable in light of decedent's feelings concerning the pending guardianship. Granted that Mr. Hartung initiated the conversation about wills at the interview in the hospital, the attorney set that discussion aside and dwelled upon the guardianship matter. It was almost two months later when the attorney brought the subject of a will to decedent's attention. As soon as the subject was brought up, Mr. Hartung absented himself from the house. Although he drove decedent to the doctor's office on the day the will was signed, he was not personally present during its execution. Therefore, the evidence reflects that Mr. Hartung did not take any unfair advantage of his dominant position over decedent relative to the terms, preparation or execution of the will. In other words, Mr. Hartung went forward with sufficient proof on this issue.

Under certain circumstances, a confidential relationship can give rise to a presumption of undue influence. These circumstances require preponderating evidence that Mr. Hartung actively participated in the preparation and execution of the will and that he unduly profited therefrom. *In re Metz' Estate*, supra. The trial court found that the contestant had failed to prove the existence of these factors by preponderating evidence. The actions of Mr. Hartung at the hospital, at decedent's home on August 10, 1978, and in taking decedent to the doctor's office on August 14, 1978, are as consistent, if not more so, with those of a long–time friend as with those of a person trying to assure the execution of a will favorable to his own interests. When considering the relationship that decedent had with others in the years preceding his death, it cannot be said that his will constituted an unnatural disposition of his estate. He remembered his God, his sister, his friends and neighbors, and the man who took care of many of his daily needs for years. It must be remembered that mere general influence, however strong or controlling, not brought to bear on the testamentary act, is not sufficient, *In re Rowlands' Estate*, 70 S.D. 419, 425, 18 N.W.2d 290, 293 (1945), and that the testator has the right to select the objects of his bounty, *In re Blake's Estate*, 81 S.D. 391, 136 N.W.2d 242 (1965). Therefore, contestant is not entitled to the presumption of undue influence which arises from the existence of the confidential relationship between the testator and a beneficiary who actively participated in the preparation of the will and who unduly profited therefrom.

We now turn our attention back to the elements of undue influence. These elements are: (1) a person susceptible to such influence; (2) opportunity to exert such influence and effect the wrongful purpose;

(3) a disposition to do so for an improper purpose; and (4) a result clearly showing the effect of such influence. *In re Metz' Estate,* supra; *In re Rowlands' Estate,* supra. The burden of establishing undue influence is on the contestant. *In re Metz' Estate,* supra. As heretofore discussed, the contestant must do this without the aid of the presumption.

The trial court in its memorandum opinion found decedent to be competent and a person with a "strong personality." The testimony of decedent's doctor supports the finding that decedent was not susceptible to undue influence.

The trial court found that there was no disposition on the part of Mr. Hartung to exert undue influence. This finding in part was based upon Mr. Hartung's position of leadership in the Catholic Church. It must also be remembered that the trial judge had the opportunity to observe the demeanor of the witnesses as they testified.

▇ The trial court further found that Mr. Hartung did not unduly profit from the will. This finding was based in part on the evidence proving that decedent did not get along with his niece and that the events were triggered by the contestant when she alleged decedent to be mentally incompetent. The finding was also based on evidence showing that decedent left his estate to the Catholic Church, his sister, friends, tenants, and neighbors and that Mr. Hartung's share of the estate was not great in comparison to the shares of the other beneficiaries. As a result of the foregoing, this Court concludes that contestant simply failed to carry her burden of proof. There exists, on the record as a whole, sufficient evidence to sustain the findings and conclusions of the trial court.

Finally, contestant contends that the trial court failed to make adequate findings of fact to support its decision and satisfy the requirements of law. We have reviewed the entire record, contestant's allegations of omitted facts, and the authorities cited in support of this contention. We find the allegations to be without merit. The facts urged by contestant as relevant and necessary were either considered by the trial court in its memorandum opinion, were immaterial to the ultimate issue, occurred after the execution of the will, or were not supported by credible evidence.

Accordingly, the order admitting decedent's will to probate is affirmed.

All the Justices concur.

GROSSHANS, Circuit Judge, sitting for MORGAN, J., disqualified.