**In the Matter of the Estate of Franklin J. TILL, Deceased.**

**No. 16647.**

Supreme Court of South Dakota.

Considered on Briefs Jan. 8, 1990.

Decided July 11, 1990.

Rehearing Denied Aug. 20, 1990.

Kurt E. Solay, Haven L. Stuck of Lynn, Jackson, Shultz & Lebrun, P.C., Rapid City, for appellant.

Michael "Mick" Strain, White River, for appellees.

WUEST, Chief Justice.

This is an appeal from a will contest in which the circuit court held that the Last Will and Testament of the decedent, Frank Till (Frank), was a product of undue influence. As a result, the circuit court held this will to be invalid. We reverse.

Frank was born in July of 1899. He had three brothers and one sister, all of whom had predeceased him. Frank's sister left two children: Frank Matson and Alleyne Schaar. One of his brothers left one child

by the name of Robert Till (Robert). Frank's other two brothers had no children. Similarly, Frank never had any children, nor was he ever married.

For most of his life, Frank worked as a ranch hand. At one time, Frank worked as a ranch hand for a man named Claire Smith. Frank became a close family friend of the Smith's and he visited their home on several occasions. On one of these visits in 1984, Frank became acquainted with Julie Smith (Julie), a daughter of Claire Smith.[1] Julie was sixteen years old at the time. Julie and Frank quickly became friends. In July of 1984, Julie participated in a birthday for Frank. Subsequent to this party, Julie and Frank saw each other on a few occasions in 1985 and 1986, but they did not see each other in 1987. They did, however, exchange several letters during this period.

After Frank retired from active ranch work, he traveled, visited friends, and for certain periods of time he lived with the Robert Till family and then later with the Frank Matson family. In March of 1988, while living with the Matsons', Frank became ill and was later admitted to a hospital in Spearfish, South Dakota. Frank remained in the hospital for approximately two weeks and was treated for a heart condition. During his stay at the hospital, Frank gave Robert a power of attorney so Robert could handle his financial affairs. Upon his release from the hospital, Frank was taken to the White River Nursing Home by Robert because none of Frank's friends or relatives felt that they could handle the burden of having Frank live with them.

In the early part of July, 1988, Julie and her husband Greg Elvestad (Greg) went on a vacation and visited Julie's parents in Prairie City, South Dakota. While visiting her parents, Julie was informed that Frank was very unhappy at the White River Nursing Home, and that Frank very much wanted to live at the Mary House Nursing Home in Pierre, South Dakota. She was also informed that Frank was upset with the way Robert was handling his financial

affairs. Shortly after visiting Julie's parents, Julie and Greg then decided to visit Frank at the nursing home in White River, South Dakota. The two arrived in White River on July 9, 1988. They visited with Frank for two hours and during this time Frank informed them that he did not like the White River Nursing Home and that he was upset with the way that Robert was handling his financial affairs. After having visited with Julie and Greg, Frank asked if they would go to Robert's house to pick up some of his personal property and also to get some of his money from Robert. Julie and Greg agreed. They subsequently met Robert at his house later that night and they acquired some of Frank's personal belongings and also $382.00. These things were given to Frank the next day.

On July 11, 1988, after Julie and Greg returned to their home in Mason City, Iowa, Julie phoned the office of C.D. Kell (Kell), an attorney in Murdo, South Dakota, for the purpose of setting up an appointment for Frank so that Frank could change his power of attorney. This was done allegedly at Frank's request because Frank had a hearing problem and did not like to talk on the telephone. An appointment was scheduled for July 14, 1988. Julie and Greg then traveled back to White River on July 14, 1988, where they picked up Frank and then went to Kell's office. Julie, Greg and Frank then participated in a meeting with Kell. During this meeting, Julie indicated to Kell that Frank wanted to cancel his old power of attorney and that he wanted Kell to draft a new one. She also indicated that Frank wanted to change his will. Kell expressed a reluctance to do either of those things at that time. The meeting with Kell then ended. After the meeting, Julie suggested to Frank that he write a note to Kell stating that he wanted a new power of attorney. Frank did so and the next day Julie, Greg and Frank again met with Kell. Frank's note was given to Kell by Julie. At the end of this note there was also a request for Kell to draft a will for Frank. Having read this note, Kell surmised that this portion of the note was not

---

1. Julie's last name is now "Elvestad" by virtue of a subsequent marriage.

in Frank's handwriting. Kell again refused to draft a will for Frank because he was concerned about Frank's mental capacity.

Kell did, however, draft a new power of attorney for Frank designating a local bank as the party holding this power. A representative of the local bank reviewed this power of attorney and concluded that the language was too broad. As a result, one of the bank's representatives recommended to Frank that attorney Gene Jones (Jones) draw up a different power of attorney. This appeared acceptable to Frank, so Julie and Greg then took Frank to the office of Jones. When they arrived at Jones' office, Frank told Jones that in addition to the new power of attorney he also wanted to make a new will. Jones indicated that he would be willing to draft a will for Frank, but not on that day. Shortly after this meeting with Jones, Julie and Greg returned to their home in Iowa. Four days later, on July 19, 1988, Frank met with Jones and Jones prepared a new will for Frank which revoked all prior wills and which gave the majority of Frank's estate to Julie and Greg.

On August 1, 1988, Julie was informed there was an opening for Frank at the Mary House in Pierre. The next day Julie and Greg traveled to White River so they could take Frank to the Mary House. When they arrived at the nursing home, Julie and Greg were met by a few of Frank's relatives who insisted on taking Frank to the Mary House. Julie and Greg agreed to this and then returned home. On August 4, 1988, Frank died at the Mary House in Pierre. His last will drafted by Jones was offered for probate. Frank's relatives, who were the sole beneficiaries under Frank's prior will executed in 1980, contested this will claiming that it was a product of undue influence by Julie. The circuit court agreed and subsequently held this will to be invalid. The executor named in Frank's last will now appeals from this judgment, alleging the circuit court erred in finding that a confidential relationship existed between Frank and Julie. He further alleges that the circuit court erred in finding a presumption of undue influence

had arisen in this case. Finally, the executor alleges the circuit court erred in finding Frank's last will was the product of undue influence.

■ In addressing the allegations of error raised by the executor, we note this court will not set aside a trial court's findings of fact unless clearly erroneous. SDCL 15–6–52(a); *In Re Estate of Hobelsberger*, 85 S.D. 282, 289, 181 N.W.2d 455, 458 (1970). A finding is not clearly erroneous unless the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed by the lower court. *In Re Estate of Pierce*, 299 N.W.2d 816, 818–19 (S.D.1980); *In Re Estate of Shabley*, 85 S.D. 692, 695, 189 N.W.2d 460, 461 (1971). Additionally, we recognize all conflicts in the evidence must be resolved in favor of the trial court's findings. *In Re Metz Estate*, 78 S.D. 212, 214, 100 N.W.2d 393, 394 (1960). Having noted our standard of review, we now address the allegations of error as set forth by the executor.

■ The first allegation of error raised by the executor regards the trial court's finding a confidential relationship existed between Julie and Frank. In addressing this argument, we note the establishment of a confidential relationship in a will contest trial is significant because the burden of going forward with the evidence shifts to the beneficiary (Julie) to show she took no unfair advantage of her dominant position. *In Re Metz Estate, supra*, 78 S.D. at 222, 100 N.W.2d at 398. Furthermore, a finding of active participation in the preparation and execution of a will, coupled with a confidential relationship between the beneficiary and the decedent, raises a presumption of undue influence on the part of the beneficiary if she unduly profits under the will. *In Re Estate of Heer*, 316 N.W.2d 806, 810 (S.D.1982).

In the present case, the trial court not only found that Julie and Frank had a confidential relationship, but it also found that Julie actively participated in the preparation and execution of the will and that she unduly profited therefrom. As a re-

sult, the trial court further found that a presumption of undue influence had arisen in this case. Based upon our review of the entire evidence, we are firmly and definitely convinced that the trial court made a mistake in finding that a confidential relationship existed between Julie and Frank. Hence, Julie should not have been given the burden of going forward with the evidence to show she did not take advantage of her supposed dominant position.[2] Also, a presumption of undue influence should not have arisen due to the absence of a confidential relationship between Julie and Frank.[3]

It is well settled in this state that a confidential relationship exists whenever a decedent places trust and confidence in the integrity and fidelity of another. *In Re Estate of Weickum,* 317 N.W.2d 142, 145 (S.D.1982); *In Re Estate of Hobelsberger, supra,* 85 S.D. at 291, 181 N.W.2d at 460; *In Re Estate of Heer,* 316 N.W.2d 806, 810 (S.D.1982). Our review of the record in this case reveals that Frank did nothing which would suggest he placed his trust and confidence in Julie's integrity and fidelity to any significant degree. While we recognize that Frank did ask Julie and Greg to obtain some of his money and personal items from Robert, this singular incident certainly is not enough to establish the existence of a confidential relationship between Julie and Frank. By making this request, it is unlikely that Frank placed a significant degree of trust and confidence in the integrity and fidelity of Julie because it is clear from the record that Frank did not trust Robert with his money or belongings. Since Frank did not trust Robert, he essentially had nothing to lose by asking Julie to obtain some of his money and personal belongings from Robert.

In prior cases in which we have been presented with the question of whether a confidential relationship existed between a testator and a beneficiary, we have looked to such factors as the amount of time that the beneficiary spent with the testator, *In Re Estate of Borsch,* 353 N.W.2d 346, 348 (S.D.1984); *In Re Estate of Zech,* 285 N.W.2d 236, 239 (S.D.1979), whether the beneficiary handled many of the testators personal or business affairs, *In Re Estate of Borsch, supra; In Re Estate of Zech, supra; In Re Estate of Pierce,* 299 N.W.2d 816, 819 (S.D.1980); *In Re Estate of Weickum,* 317 N.W.2d 142, 145 (S.D.1982), and also whether the testator had ever sought the advice of the beneficiary, *In Re Estate of Borsch, supra; In Re Estate of Weickum, supra.* Although these are not the only factors that may be considered in determining if a confidential relationship exists between a testator and a beneficiary, they are nevertheless significant factors which demand consideration in the resolution of this issue.

Our review of the record reveals that none of the above-mentioned factors are present in this case. Julie spent very little time with Frank. The two met in 1984. They saw each other only a few times in 1985 and 1986, and they did not see each other at all in 1987. In 1988, Julie, along with her husband Greg, visited Frank on two occasions shortly before he died. Although Julie and Frank did communicate through correspondence, it is unlikely they communicated by telephone since Frank had a hearing problem and did not like to speak on the telephone. Furthermore, not only is it clear Julie spent little time with Frank, it is also clear from the record that Julie never handled any of Frank's personal or financial affairs. Rather, Frank handled much of his own personal affairs and Robert handled Frank's financial affairs. Finally, we note there is nothing in the record which indicates Frank ever sought the advice of Julie regarding any of his affairs. While Frank did give consideration to some of Julie's suggestions, Frank

---

2. The trial court made no finding as to whether Julie succeeded in showing that she did not take advantage of what the trial court deemed to be her dominant position.

3. Since a confidential relationship did not exist in this case, we do not address the issue of whether Julie actively participated in the preparation or execution of the will, nor do we address the issue of whether she unduly profited therefrom.

did not rely on Julie in any respect for advice.

Considering all of the aforementioned facts, we conclude there is not sufficient evidence to show that a confidential relationship existed between Julie and Frank. Hence, we conclude the trial court erred in finding a confidential relationship existed in this case. Furthermore, having reached this conclusion, we must also conclude the trial court erred in finding a presumption of undue influence had arisen in this case since in order to establish this presumption, one must first establish that a confidential relationship existed between the beneficiary and the testator.

■■■ Although we have concluded a presumption of undue influence had not been established in this case, this does not end our review in this particular case.[4] The record reflects that the trial court also found that the will contestants had established, by a preponderance of the evidence, the four elements necessary to prove the existence of undue influence.[5] These elements include: (1) decedent's susceptibility to undue influence; (2) opportunity to exert such influence and effect the wrongful purpose; (3) a disposition to do so for an improper purpose; and (4) a result clearly showing the effects of undue influence. *Matter of Estate of Pierce*, 299 N.W.2d 816, 819–820 (S.D.1980); *In Re Metz Estate*, 78 S.D. 212, 215, 100 N.W.2d 393, 394 (1960); *In Re Rowlands' Estate*, 70 S.D. 419, 426, 18 N.W.2d 290, 293 (1945). Since the trial court found the contestants had established the existence of these elements by a preponderance of the evidence, it concluded that the existence of undue influence had been established in this case. The executor contends the trial court was clearly erroneous in finding the contestants had proven these elements by a preponderance of the evidence, and in subsequently finding that undue influence had existed in this case. Based upon our review of the record, we agree with the executor's contentions.

We first address the trial court's finding that Frank was susceptible to the undue influence of Julie. The preponderance of the evidence in this case clearly indicates that Frank was not a person who was susceptible to undue influence. During the trial of this matter, several people who were acquainted with Frank, including two long-time friends, testified Frank was a very strong willed person. The contestants of the will presented no evidence to the contrary. Frank's strong will was also clearly evidenced by the fact that shortly after he was admitted to the White River Nursing Home, he began to take measures to gain admittance to the Mary House by having an application for admittance sent to the Mary House. From the record, it appears the trial court did not give any consideration to this evidence in determining if Frank was susceptible to undue influence.

In finding that Frank was susceptible to the undue influence of Julie, the trial court emphasized that Frank was an old person who was in poor health. While it is true that Frank had some physical problems, there is no evidence that Frank was incapacitated to any significant extent as a result of these physical problems. Frank was able to walk with some assistance and he was obviously able to leave the nursing home when he desired as evidenced by the fact that he attended attorney Jones' office on three occasions shortly before his death. Additionally, several people who were acquainted with Frank and who had seen Frank shortly before his death, testified they were surprised to learn of his death because he appeared to be in good health shortly before his death. Although a decedent's age and health are relevant to the issue of susceptibility, Frank's physical condition was not so poor as to overbear

---

4. The trial court made no finding as to whether Julie successfully rebutted this presumption of undue influence.

5. Of course, the trial court's finding of a presumption of undue influence did not weigh as a factor in this determination since a "presumption is not evidence of a fact, but purely a conclusion." *King v. Johnson Bros. Const. Co.*, 83 S.D. 69, 76, 155 N.W.2d 183, 186 (1967). It is never to be placed in the scale and weighed as evidence. *Id.*

his strong-willed character, thus rendering him susceptible to undue influence.

Frank's desire to move to the Mary House was also listed by the trial court as a factor tending to show that Frank was susceptible to undue influence. Considering this factor in light of the other evidence presented at trial, however, it is evident this factor indicates very little as to Frank's susceptibility to the undue influence of Julie. The record clearly reflects Frank had already submitted an application for admission to the Mary House before Julie had visited him in July of 1988, and he was put on a waiting list. Hence, there was nothing more that Julie could do to help Frank gain admission to the Mary House. While it is true Julie did offer to help Frank move to the Mary House once he did gain admission, the record reflects two other close friends of Frank also told him they would help him move as well. Furthermore, it is also clear Frank's relatives were willing to help Frank move to the Mary House since they were the ones who ultimately insisted on taking him to this nursing home. Therefore, it is unlikely Julie could have influenced Frank to any significant degree merely by offering to help him move to the Mary House.

Finally, the fact Frank was lonely at the nursing home with few relatives and friends to visit him was also listed as a factor indicating Frank's susceptibility to undue influence. This fact gives little support to the contention that Frank was susceptible to the undue influence of Julie, however, since Julie lived hundreds of miles away from Frank and obviously could not visit him on a regular basis. In fact, the finding that Frank was lonely and had few family and friends to visit him weighs more in the favor of upholding the will since Frank may very well have decided not to provide for those people who did not see fit to visit him. This is particularly true when one considers the undisputed fact that Frank was a strong-willed person. It is for these reasons that we hold, based upon an entire review of the evidence, that the preponderance of the evidence clearly does not support the conclusion that Frank was susceptible to the undue influence of Julie. Hence, we conclude the trial court was clearly erroneous in finding to the contrary.

Based upon our entire review of the evidence, we also must conclude the trial court erred in finding Julie had an opportunity to influence Frank. This finding is not supported by a preponderance of the evidence. As one of the factors indicating Julie did have an opportunity to influence Frank, the trial court held that Julie and Frank had a confidential relationship. As we noted previously, however, Julie and Frank did not have a confidential relationship. As another factor, the trial court held Julie knew of Frank's desire to move to the Mary House. While this may be true, there was essentially nothing Julie could do that Frank had not already done as far as efforts to gain admission to the Mary House were concerned. The fact that Julie was willing to help Frank move to the Mary House may have provided her with an opportunity to influence Frank. The record, however, clearly reveals that Julie was not the only one who promised to help Frank move. Two other long-time friends also told Frank that they would help him move upon his gaining admission to the Mary House. Therefore, it is unlikely that Julie had an opportunity to influence Frank to any significant degree in this respect.

In resolving the issue of whether Julie had an opportunity to influence Frank it is important to note Julie lived hundreds of miles away from Frank. While it may have been true Frank was lonely and had few visitors, it is unlikely Julie could influence Frank by promising to keep him company since she lived so far away from Frank and since Frank did not like to use the telephone. Hence, Julie could not influence Frank by promising to visit him on a regular basis. While this court recognizes that Julie had visited Frank prior to the execution of the will, this does not necessarily mean Julie had an opportunity to influence Frank. To some extent it must also be shown that Julie had the potential to influence Frank while she visited him. Julie had little to offer Frank, and consider-

ing Frank's strong-willed nature, we believe it is clear Julie never had an opportunity to influence Frank. Hence, we hold the trial court was clearly erroneous in making the finding that Julie did have an opportunity to influence Frank.

We next address the issue of whether Julie had the disposition to exert undue influence upon Frank. The trial court held the preponderance of the evidence established that Julie did have such a disposition. Based upon our entire review of the record, we are firmly convinced the trial court erred in making this finding. The record clearly reveals Julie and Frank had a close relationship. Prior to Frank's death, Julie was accustomed to doing kind things for Frank including sending him letters and planning a birthday party for Frank. The record is devoid of any evidence which suggests that Julie ever tried to obtain any of Frank's property. In fact, the evidence points to the contrary. In assisting Frank to remove Robert as power of attorney, Julie sought to have *the bank, not herself* serve in that capacity. Nothing in the record reflects an attempt by Julie to obtain a power of attorney over Frank's property. If Julie did have a strong desire to gain control over Frank's property, it is likely she would have requested Frank to grant her a power of attorney. No such request was ever made. This strongly indicates that Julie did not have the disposition to exert undue influence upon Frank.

We recognize that after Frank had executed his last will, Julie wrote to Frank inquiring as to whether he had indeed executed the will. However, in this letter, there was no indication Julie was aware of how Frank intended to dispose of his property and there were no suggestions she should be provided for in that will. The same is true with respect to a letter written by Julie to Frank in which she inquired about whether Frank had any life insurance and, if so, whether his relatives were the beneficiaries. By this letter Julie did not suggest she should be declared the beneficiary of the life insurance. While Julie's interest in this insurance may be the subject of some speculation, it is simply not sufficient to show she had a disposition to

influence Frank in light of the other evidence that was presented regarding Julie's strong relationship with Frank. For these reasons, we are firmly convinced that the trial court made a mistake in finding Julie had a disposition to exert undue influence upon Frank.

Finally, we address the issue of whether, in the present case, there was a result clearly showing the effects of undue influence. The trial court found that such a result had been established by a preponderance of the evidence. However, in support of this finding, the trial court simply stated Frank's last will was a result showing the effects of undue influence. This mere statement is simply not sufficient to support the trial court's finding with respect to this issue. In fact, an entire review of the record in this case reveals that Frank's last will was not a result which clearly showed the effects of undue influence.

Prior to the 1988 will, the last will Frank had executed was in 1980. In the 1980 will, Frank left all of his estate to his relatives. What the trial court failed to note, however, was the fact that in 1980, Frank and Julie had not been acquainted with each other. Frank and Julie first became acquainted with each other in 1984 and thereafter developed what the trial court conceded was a close and loving relationship. Such a relationship is clearly revealed in the letters Frank and Julie sent to one another. Considering this strong relationship, it would be extremely *unlikely* for Frank not to provide for Julie after his death.

In the present case, there was an abundance of evidence showing Frank and Julie had a close and loving relationship. On the other hand, there was very little evidence, if any, which indicated Frank had a close and loving relationship with any of his collateral relatives. In fact, the greater weight of the evidence indicates Frank was upset with his relatives. It is undisputed that Frank's relatives placed him in a nursing home which he hated and considered as a "jail." Rather than making life more pleasant by frequent visits and contacts, Frank's relatives (at least in Frank's mind)

ignored him. This is evidenced by the fact that Frank had to send Julie to Robert's house to recover several of his personal belongings and also some spending money. If Frank's relatives had paid more attention to Frank's needs and desires, Frank would not have had to make this request of Julie. In addition, Frank was clearly upset with Robert's handling of his financial affairs. Robert testified he was aware that Frank was concerned about his finances. Robert then admitted he did not visit Frank to discuss these concerns because Frank was getting bank statements. Such neglect could hardly have been pleasing to Frank. Finally, we note that Frank's concerns about the handling of his financial affairs were not unfounded. After Robert was removed as power of attorney, and was replaced by the bank in that capacity, he handed over $2300 *in cash* belonging to Frank. Robert did not deposit this money in Frank's account stating "that wasn't the way Frank did business".

Considering all of the above-mentioned facts, it is hardly surprising that Frank's "blood relatives" were excluded from the bulk of his estate. Also, considering the loving relationship that existed between Julie and Frank, it is not surprising that Frank decided to leave the bulk of his estate to Julie. Simply stated, it is very likely Frank would have provided for Julie to a significant extent even in the absence of the alleged undue influence. Therefore, Frank's final will is not a result which *clearly* shows the effects of undue influence. Hence, we must conclude that the trial court was clearly erroneous in finding Frank's last will was a result which clearly showed the effects of undue influence.

As a final matter concerning the trial court's finding of undue influence, we note that in order for undue influence to exist, the influence "must be such as to destroy the free agency of the testator and substitute the will of the person exercising it for that of the testator." *In Re Estate of Blake*, 81 S.D. 391, 398, 136 N.W.2d 242, 246 (S.D.1965). Considering the close relationship between Frank and Julie, it is extremely likely that Frank desired to provide for Julie to a significant extent after his

death. This very likely was Frank's will or desire. Hence, if Julie did exercise influence over Frank, it is extremely unlikely that this amounted to *undue* influence since it is unlikely that Julie's will was substituted for that of Frank's insofar as Frank's last will and testament is concerned. This further supports the conclusion the trial court erred in finding Frank's last will was the product of undue influence.

From our examination of the entire record we are left with a firm and definite conviction the trial court erred in its findings of fact and conclusions of law. Accordingly, we reverse as to the denial of probate on the grounds of undue influence and we remand the matter to the court with instructions to admit the will to probate.

Judgment is reversed.

MORGAN and MILLER, JJ., concur.

SABERS, J., dissents.

HENDERSON, J., deeming himself disqualified, did not participate.

SABERS, Justice (dissenting).

The majority opinion jumps into the jury box of the fact finder and rewrites the findings of fact and conclusions of law contrary to law and contrary to this court's own rule. SDCL 15–6–52(a) provides in part:

> Findings. of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

The majority opinion guts the heart of this suit, despite the above rule and the entry by the trial court of forty-one explicit findings of fact and eleven conclusions of law.

A finding is not clearly erroneous unless upon consideration of the entire evidence the reviewing court is left with a definite and firm conviction that a mistake has been committed by the lower court. *In re Estate of Pierce*, 299 N.W.2d 816, 818–19 (S.D.1980); *In re Estate of Shabley*, 85 S.D. 692, 695, 189 N.W.2d 460, 461 (1971).

All conflicts in the evidence must be resolved in favor of the trial court's findings. *In re Estate of Metz,* 78 S.D. 212, 214, 100 N.W.2d 393, 394 (1960). It is not our function to decide this case on the basis of what we would have done were we, individually, the trial judge. *In re Estate of Pierce, supra* at 819.

The evidence presented at trial is more than sufficient to justify the trial court's finding that a confidential relationship existed between Frank and Julie. As the majority correctly notes, it is well-settled law in this state that a confidential relationship exists whenever a decedent places trust and confidence in the integrity and fidelity of another. *In re Estate of Weickum,* 317 N.W.2d 142 (S.D.1982); *In re Estate of Hobelsberger,* 85 S.D. 282, 181 N.W.2d 455 (1970). The record reflects that Frank and Julie had a close, intimate relationship. Correspondence between the two indicates they had strong feelings for each other. Frank confided in Julie about his personal financial affairs, showed her bank statements, and informed her of his discontent with Robert as the holder of his power of attorney. He placed trust in Julie's fidelity and integrity by asking her to retrieve some of his money and personal items from Robert. In addition, Frank allowed Julie to participate in his discussions with Attorneys Kell and Jones. In fact, Kell testified that Julie's participation in Kell's first meeting with Frank caused him to believe that she was acting as a spokesperson for Frank. He testified that at one meeting Frank "Didn't say much of anything.... He didn't seem to be with it."

In addition, the trial court prepared detailed, well-reasoned findings of fact and conclusions of law, which included the following findings:

1. "Julie discovered that Frank was very receptive to her suggestions."

2. "On the statement concerning the power of attorney signed by Frank and delivered to Kell on July 15, 1988, Julie wrote, or caused to be written, after Frank's signature, a request that a will be drawn for Frank, which statement was not produced at trial, or lost or destroyed prior to trial, by Julie."

3. "Julie, in her letters to Frank ... made the following statements to elevate her image and that of her family members and lower the image of the Tills and Matsons and Sparks in Frank's eyes: ... (3). 'My mind can't comprehend the things that the 'Tills' have done to you or having Isabel stick her nose into the situation.' "

The trial court also found that Julie's letter to Frank of July 29 was significant in several respects. She wrote:

Dearest Frank, I received your letter yesterday. It is always good to hear from you! It sounded like you had a nice birthday. I was so happy to hear that! Roxie told me that she was going down to see you. I bet that was a surprise? Do you feel at ease with things now? I know it won't be 100% good until you get to the Mary House, 'cause I know how badly you want to be there. Did Karen take you to Murdo on Wednesday? I hope she is treating you alright. You said in your letter that Gene Jones changed your will the way you wanted it. You didn't have to meet with him for a second time? He changed it for you on the first visit? I hope everything will be alright, considering Gene Jones is *good* friends with Beulah (Till). I pray he keeps your business confidential. I was so happy to hear that you have stated a specific burial and when that time comes, they *have* to put you where you requested. I wish I could come and visit you everyday. I enjoy your company so much. Frank, you are so special to Greg and I—we love you dearly. Did you get any cards from the '"Tills" or "Matsons", or "Sparks" on your birthday? Did Karen and her husband come and visit you on your birthday? It is generous of you to give Greg and I some of your shirts and your black trunk the next time we come up, as you stated in your letter— that is very nice of you! We are looking forward to seeing you again sometime.

Greg and I are busy right now taking care of a bunch of insurance for our car,

renters insurance, health and life. It gets to be so expensive. Sometimes I think those insurance companies just take all your money, but one has to have it in this day and age. I suppose the only insurance you have to pay on is health, or do you have a life insurance policy on yourself? If you do, is Bob Till or Isabel Matson the beneficiary? If I recall—Isabel had said something about a life insurance policy, when they sent you off to White River. But maybe she didn't know what she was talking about. I don't think she knows half of anything. I have never cared for Matsons or Sparks, I never felt like they really cared for anyone—but themselves—Very selfish!

There is a Fair up in Albert Lea, Minn tonite, Greg and I are going to that.

I guess that is all for now—Write soon—We Love You!

Love, Julie & Greg

Based in part on the letter the trial court found:

f. The court finds that there was no reason for Julie to make any of the negative statements about the Tills or Matsons or Sparks to Frank, except, perhaps, for Julie's knowledge that Robert Till was not handling Frank's financial affairs to his satisfaction, and that those statements were made to influence Frank to show no favor to the Tills, Matsons or Sparks.

g. The court further finds that the statements made by Julie in her letter of July 29th to Frank concerning the problems that she and Greg were encountering with insurance was a deliberate, calculated lead-in to asking Frank whether he had any life insurance and, if so, the names of the beneficiaries, with the thought that Frank would, since he had changed his will, change the beneficiaries on any life insurance he had to Julie or members of her family.

. . . . .

i. Julie's letters to Frank of July 18, 21, and 29, 1988, were all received by Frank after the July 19, 1988, will was executed. Therefore, those letters could not have influenced Frank to make the dispositions in his new will. However, the only persons who could testify as to the conversations between Julie, Greg and Frank on July 9, 10, 14 and 15, are Julie and Greg. Since the court has found that there was a confidential relationship between Julie and Frank, the proponents of the will must go forward with the evidence to show that Julie did not unduly influence Frank in the preparation of the new will prior to its execution. The court finds that since Julie's letters to Frank of July 18, 21, and 29, 1988, clearly show that she attempted to unduly influence Frank, the court concludes that she had the same motive in her conversations with Frank on July 9, 10, 14 and 15, 1988.

The key conclusions of law, which are being gutted by the majority opinion, are as follows:

5.

SDCL 29-2-5 provides that: "A will or part of a will procured to be made by ... undue influence, may be denied probate...."

6.

When a confidential relationship is established between the testator and the beneficiary, the burden of going forward with the evidence shifts to the beneficiary to show that he took no unfair advantage of his dominant position. *In re Metz' Estate,* [*supra*].

7.

A confidential relationship exists whenever a decedent has placed trust and confidence in the integrity and fidelity of another. *Matter of Estate of Weickum,* [*supra*].

8.

Since it is the finding of this court that a confidential relationship existed between Frank and Julie, Julie must go forward with the evidence to show that she did not take advantage of the relationship to her own profit.

**9.**

The existence of a confidential relationship does not raise a presumption of undue influence, however, unless the beneficiary actively participated in the preparation and execution of the will and unduly profited therein. In re Estate of Anders, [88 S.D. 631,] 226 N.W.2d 170 (1975).

**10.**

To establish the existence of undue influence, contestants must prove by a preponderance of the evidence four essential elements: (1) decedent's susceptibility to undue influence, (2) opportunity to exert such influence and effect the wrongful purpose, (3) a disposition to do so for an improper purpose and (4) a result showing the effects of such influence. *Matter of Estate of Weickum,* *[supra]; Matter of Estate of Pierce, [supra]; Matter of Estate of Landeen,* 264 N.W.2d 521 (S.D.1978).

**11.**

That Frank's July, 1988, will is the product of undue influence and it is hereby denied admission for probate.

In essence, the trial court found that there was a confidential relationship between Frank and Julie and that, in effect, and for whatever reasons,* Frank was putty in her hands. The trial court was in a position to observe the witnesses and judge their credibility. At best, the majority opinion provides "lip service" to our rules of appellate review and rewrites the findings of fact and conclusions of law. This is clearly wrong. I would affirm the trial court judge because he was not clearly erroneous.

---

* Julie and Greg were in debt about $20,000 at the time of trial.