In the Matter of the ESTATE OF Lena Marguerite MADSEN a/k/a Margie L. Madsen.

No. 18841.

Supreme Court of South Dakota.

Considered on Briefs April 26, 1995.

Decided Aug. 16, 1995.

Allen G. Nelson and Joseph M. Butler of Bangs, McCullen, Butler, Foye and Simmons, Rapid City, for appellee Estate.

Dale R. Hansen and Gordon D. Swanson of Hansen and Hubbard, Sturgis, for appellants Gloria Hamby and Serena Reichert.

MILLER, Chief Justice.

Appellants Serena Reichert and Gloria Hamby appeal the trial court's decision to admit their mother's will of March 4, 1993, for probate. They contend the will was the product of undue influence by their brother, Stacy Madsen, the sole beneficiary under the will. We affirm.

## FACTS

Since March of 1944, Lena Marguerite Madsen, a/k/a Margie L. Madsen, lived with her husband on a ranch near New Underwood. Margie and her husband had five children, three sons and two daughters. Their oldest son died in 1968. When her husband died in the spring of 1989, Margie inherited the ranch. Another son, Glen, died two weeks later.

After the deaths of her son and her husband in 1989, Margie's only living son, Stacy, assumed control of the physical operation of the ranch. Margie agreed to give him a share of the crops and calves that were raised in exchange for his continued work on the ranch.

For nearly all of his life, Stacy had lived and worked at the ranch. As an adult, he resided in a trailer located on the property, a short distance from the main house. Margie's daughter, Gloria, had left the ranch years before. Margie's other daughter, Serena, left the ranch shortly after her father and brother died in 1989.

Throughout her life, Margie experienced bouts of mental illness. Ultimately, she was diagnosed as having schizoaffective disorder, an illness which could be controlled with medications. When she neglected to take her medications, Margie's illness manifested itself in symptoms of paranoia, delusions, depression, and agitation.

Following a back injury in early 1992, Margie experienced a psychotic episode which culminated in her hospitalization. During this time, Margie's children contemplated establishing a guardianship over her affairs and moving her from the ranch to an apartment or nursing home. In late April or early May of 1992, Margie's psychiatrist discovered that a pain medication, prescribed by another doctor, was the likely cause of Margie's psychotic symptoms. Margie stopped taking the medicine, and her symptoms dissipated. At about the same time, Margie and her children met to discuss her future plans. When Serena and Gloria suggested a guardianship and a change of residence for Margie, she staunchly opposed it. Noting his mother's improvement as a result of her medication change, Stacy and his fiancée also disagreed with the proposal to move Margie and appoint a guardian. Margie returned to her home on the ranch and no guardianship was established. According to some testimony, Margie's relationship with her daughters cooled after their attempt to establish a guardianship over her affairs.

At the end of 1992, Stacy told his mother he was no longer interested in planting and cultivating a tract of farm land she owned. After contacting various neighbors about leasing the land, Margie discussed a leasing arrangement with Jim Madsen, her nephew. When Jim balked at some of the terms of the lease, Margie offered to sell the land to him.

Serena learned of the proposed sale on March 1, 1993, and immediately contacted Stacy and Margie. She told them Margie would be better off leasing the land, but that she and her husband would be interested in matching or bettering Jim's offer if Margie insisted on selling. When Serena and her husband, Ross, arrived at Margie's home to discuss the sale, an argument ensued between Ross and Stacy. Margie asked Serena and Ross to leave. When they refused, she called the sheriff. Ultimately, Ross and Stacy stopped arguing and the sheriff was told not to come to the house. According to testimony, Ross and Serena left Margie's home on an amicable note and the issue of the sale or lease of the farm land was left undecided.

The next day, March 2, 1993, Margie contacted her attorney's office about changing her existing will, dated May 16, 1991. (The 1991 will distributed her property equally among her three living children.) Margie indicated she wanted to disinherit her two daughters and leave all her property to Stacy. The following day, Stacy drove his mother to her attorney's office in Rapid City, South Dakota. Margie and her son met with her attorney Jon LaFleur. He gave Margie

a draft will which incorporated the changes she had requested. Margie read the draft, and Stacy also read all or part of it.

Once Margie had read the will, LaFleur asked to speak to her alone. After Stacy left the room, LaFleur asked Margie whether she was certain she wanted to leave all her property to Stacy. According to LaFleur, Margie expressed no hesitations about disinheriting her daughters and giving all her property to her son. She told him that her daughters were living comfortably and that she wanted Stacy to have the ranch. Margie then spoke to one of LaFleur's partners. She described the nature of her estate and her desire to leave all of her property to her son Stacy. She again explained that she believed her daughters were financially comfortable and that she wanted her son to own the ranch. She did not indicate any disaffection or animosity toward her daughters. Margie made an appointment to execute the will the following day.

The next day, Stacy drove Margie to a previously scheduled appointment with her psychiatrist. Margie obtained a note from him which read, "There is no reason that Margie Madsen cannot do business or make decisions for herself at this time. Thank you." Then Stacy and Margie proceeded to LaFleur's law offices. Stacy remained in the waiting room while LaFleur spoke to Margie alone in his office. She reviewed the will and told LaFleur it was the way she wanted it. She then executed the will in the presence of witnesses. Stacy remained in the waiting room and did not participate in the execution of the will.

On March 12, 1993, Margie and Stacy returned to LaFleur's office. They asked LaFleur's partner to draft an agreement which would allow Stacy to lease most of Margie's farm and ranch land until her death. The agreement was not drafted, because the attorney required additional information on the land. Margie died seven days later, on March 19, 1993.

On April 8, 1993, Stacy, the named executor, filed a petition for probate of the March 4, 1993, will. Serena and Gloria filed a timely opposition to the petition for probate. They alleged the will was the product of Stacy's undue influence over Margie.[1] After a three-day trial, the trial court entered an order denying the contestants' objections and admitting the will to probate. Serena and Gloria appeal.

## DECISION

The sole issue on appeal is whether Margie's will of March 4, 1993, was the product of undue influence exerted by her son Stacy. The trial court found no undue influence.

■ The question of undue influence is an issue of fact to be determined by the trial court. SDCL 30–6–18(2), *repealed* 1995 S.D.Sess.L. ch. 167, § 149.[2] Our standard of review in such cases is well-settled:

In reviewing this matter, we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. The findings of fact of the trial court shall not be set aside unless they are clearly erroneous. In addition, we must review the facts in the light most favorable to the findings of the trial court and all conflicts in the evidence must be resolved in its favor.

*In re Estate of Jones,* 320 N.W.2d 167, 169 (S.D.1982) (citations omitted), *affirmed after remand,* 370 N.W.2d 201 (S.D.1985).

■ A will procured by undue influence may be denied probate. SDCL 29–2–5, *repealed* 1995 S.D.Sess.L. ch. 167, § 96.[3] The elements of undue influence are: (1) decedent's susceptibility to undue influence, (2) opportunity to exert such influence and effect the wrongful purpose, (3) a disposition to do so for an improper purpose, and (4) a result showing the effects of such influence. *In re Estate of Borsch,* 353 N.W.2d 346, 349 (S.D. 1984) (citing *In re Estate of Weickum,* 317 N.W.2d 142, 145 (S.D.1982)). Ordinarily,

1. Other objections raised by the contestants were dropped before the trial.

2. The repeal of SDCL 30–6–18(2) applies only in cases where the testator dies on or after July 1, 1995. 1995 S.D.Sess.L. ch. 167, § 8–101.

3. The repeal of SDCL 29–2–5 only applies in cases where the testator dies on or after July 1, 1995. 1995 S.D.Sess.L. ch. 167, § 8–101.

contestants must prove these elements by a preponderance of the evidence. *Id.* However, "[a] presumption of undue influence arises when there is a confidential relationship between the testator and a beneficiary who actively participates in preparation and execution of the will and unduly profits therefrom." *Pope v. Brown,* 357 N.W.2d 510, 513 (S.D.1984) (citing *Weickum,* 317 N.W.2d 142). No presumption arises unless all three requirements are satisfied. *Id.* at 514 (citing *In re Estate of Pierce,* 299 N.W.2d 816 (S.D. 1980)).

The trial court found that no confidential relationship existed between Margie and Stacy. Our deferential review of the record indicates otherwise. "A confidential relationship exists whenever a decedent has placed trust and confidence in the integrity and fidelity of another." *Weickum,* 317 N.W.2d at 145 (citing *In re Estate of Hobelsberger,* 85 S.D. 282, 181 N.W.2d 455 (1970)). In determining whether a confidential relationship exists, we consider such factors as the amount of time the beneficiary spent with the testator, whether the beneficiary handled many of the testator's personal or business affairs, and whether the testator ever sought the advice of the beneficiary. *In re Estate of Till,* 458 N.W.2d 521, 524 (S.D.1990).

Here, all three factors are satisfied. First, Stacy spent considerable time with his mother. Evidence showed that she was reluctant to eat properly and to take medications to control her mental illness. Consequently, Stacy visited Margie daily to ensure that she was taking her prescriptions and maintaining a proper diet. Stacy and his wife also ate almost all of their meals with his mother. Second, Stacy handled many of Margie's business affairs. Margie trusted Stacy to conduct her ranching operation. Because she was unable to perform the physical labor required on the ranch, Stacy and the help he hired were responsible for the day-to-day operations. Testimony suggested that while Stacy consulted with Margie on major ranching decisions, he essentially controlled cattle sales, equipment purchases, and capital improvements on the ranch. Stacy was also responsible for dividing the income from the cattle operation and distributing Margie's share to her. Third, Margie sought Stacy's advice on important matters. When Margie

reviewed the draft of her 1993 will, she asked Stacy for his opinion of it. She also relied on his business judgment by allowing him to conduct the ranch operations. *For a discussion of similar cases, see In re Estate of Smith,* 481 N.W.2d 471 (S.D.1992), *aff'd after remand,* 520 N.W.2d 80 (S.D.1994); *In re Estate of Burk,* 468 N.W.2d 407 (S.D.1991).

Although a confidential relationship existed between Stacy and Margie, no presumption of undue influence arises, because Stacy did not participate in the preparation and execution of the will. Testimony indicated that Margie independently called her attorney's office about changing her will so as to disinherit her two daughters. When Margie met with her attorney the following day, Stacy left the room shortly after Margie finished reading the will. LaFleur discussed the will alone with Margie, and his partner also spoke with her to confirm that she had made an independent and uncoerced decision to change her will. According to LaFleur and his partner, Margie understood that her daughters would not receive any of her estate. She wanted to leave the ranch to Stacy, because her daughters were financially secure and she wanted the same for Stacy. She reported feeling no pressure from Stacy regarding the disposition of her estate, and showed no hesitancy or uncertainty about her decision. According to their testimony, Stacy did not participate in the discussion of the terms of the will or in the execution of the will.

The only evidence which points to Stacy's possible involvement in the will preparation is the fact that he drove his mother to the attorney's office on March 3 and 4, 1993. However, the record suggests that Stacy had other reasons for accompanying his mother to Rapid City. On March 3, he had an appointment with his doctor, and he and his mother proceeded to the doctor's office after the meeting with her attorney. On March 4, Margie had an appointment with her psychiatrist, and testimony indicated that a family member typically accompanied Margie on these visits.

Because the evidence fails to establish Stacy's participation in the preparation and execution of the will, no presumption of un-

due influence arises. *Pope,* 357 N.W.2d at 513–14. However, the finding of a confidential relationship does require "close judicial scrutiny." *Id.* at 514 (citing *Pierce,* 299 N.W.2d at 819). Furthermore, when a confidential relationship exists, the burden of going forward with the evidence shifts to the beneficiary to show he took no unfair advantage of the decedent. *Till,* 458 N.W.2d at 523 (citing *In re Metz,* 78 S.D. 212, 222, 100 N.W.2d 393, 398 (1960)). The contestants retain the burden of proving undue influence by a preponderance of the evidence. *Burk,* 468 N.W.2d at 411; *Pope,* 357 N.W.2d at 513 (citing *In re Estate of Anders,* 88 S.D. 631, 637, 226 N.W.2d 170, 173 (S.D.1975)).

 The trial court found that Stacy did not take advantage of the confidential relationship with his mother. The trial court also found that three of the four requirements for undue influence were not satisfied, because: (1) Margie was not susceptible to undue influence, (2) Stacy had no disposition to exert undue influence for an improper purpose, and (3) the will of March 4, 1993, did not show the effects of undue influence.[4] We agree.

 The mere existence of a confidential relationship between the testator and a beneficiary does not establish that the testator is susceptible to undue influence. *Burk,* 468 N.W.2d at 411–12 (finding testator had a confidential relationship with a beneficiary, but finding no susceptibility to undue influence). Although Stacy assisted Margie with her personal and business affairs, testimony indicated that Margie remained independent and strong-willed. For example, the record shows that Margie successfully resisted her daughter's efforts to establish a guardianship over her affairs. Further, despite repeated requests from Serena, Margie refused to give or sell portions of the ranch to Serena and her husband. Additionally, during negotiations on a potential land lease with her nephew, Margie negotiated an extremely favorable lease for herself. None of this behavior indicates that Margie was susceptible to the influence of others.

4. The trial court concluded that Stacy had the opportunity to exert undue influence, but that he

Likewise, Stacy had no disposition to exert undue influence. Evidence indicated that Stacy was devoted to his mother's care and well-being, visiting her daily to ensure she ate properly and took her medications. During the time Stacy operated the ranch, Margie received a comfortable income and paid off all of her debts. Although Stacy often told Margie and others that he wanted to purchase the ranch, there was no evidence that he ever encouraged Margie to will the ranch to him outright. In contrast, testimony suggested that Serena persistently voiced her desire to inherit certain portions of the ranch from her mother. Likewise, Gloria complained to her mother about her lack of inheritance after her brother Glen's death, and claimed she should receive $10,000 and the temporary use of her mother's car. Margie told a friend her daughters were anxious to divide her estate and treated her like she was "already dead." There was no testimony indicating that Stacy was similarly preoccupied with his inheritance or pressuring his mother to treat him favorably in her will.

 Finally, the will of March 4, 1993, did not show the effects of undue influence. Undue influence is found when the free agency of the testator has been destroyed and the will of another is substituted for that of the testator. *In re Estate of Blake,* 81 S.D. 391, 398, 136 N.W.2d 242, 246 (S.D.1965). The evidence shows that the will of March 4, 1993, reflected Margie's own, independent wishes regarding the disposition of her estate. After the death of her husband and her other sons, Margie repeatedly told friends and relatives of her desire for Stacy to have the ranch. Margie discussed options of selling or giving the ranch to him during her lifetime. These plans deteriorated when Margie learned that Stacy lacked the collateral to finance a purchase and that adverse tax consequences would result from a gift of the ranch. Additionally, Margie feared that if she willed the ranch to all three of her children, it would be put up for sale and Stacy would be unable to buy the entire tract. After Margie executed the March 4,

did not do so.

1993, will, naming Stacy as the sole beneficiary, she expressed satisfaction to friends. The day before she died, Margie told a friend she was "at peace" and that, since she could not make all her children happy, she had decided to make one happy. The same day, Margie called another friend and talked about her new will. She told her friend she had everything the way she wanted it. She explained that she had left the ranch to Stacy, as her daughters were already well-situated and able to rely on their husbands. According to this testimony, she specifically wanted Stacy to be able to keep the Madsen ranch.

" 'A testator has the privilege and right to dispose of his property as he chooses within limits and in the manner fixed by statute. The law does not require that he recognize his relatives equally or at all.' " *In re Estate of Linnell,* 388 N.W.2d 881, 885 (S.D.1986) (quoting *Blake,* 81 S.D. at 398, 136 N.W.2d at 246). The trial court found that the will of March 4, 1993, reflected Margie's own testamentary desires, free from any undue influence. We agree and affirm.

AMUNDSON, J., concurs.

SABERS, KONENKAMP and GILBERTSON, JJ., concur in result.

SABERS, Justice (concurring in result).

I agree that a confidential relationship existed between Stacy and his mother. As shown by the evidence, he was practically her alter ego in many respects. She even asked him his opinion of her will. The opinion states "Stacy left the (attorney's) room shortly after Margie finished reading the will." So how can one say he didn't participate in the will? He also was the one who drove his mother to or suggested getting the "competency" statement from the doctor. Even though Stacy may not have had a disposition to exert undue influence for an improper purpose, he clearly prospered from the change in the wills—from *equal* treatment for all siblings to *everything* to him and *zero* for his sisters. Therefore, I cannot even agree with the statement in the opinion that "the will of March 4, 1993, did not show the effects of undue influence." *See Borsch,* 353 N.W.2d at 349.

Although a confidential relationship clearly existed between Stacy and his mother, there is no evidence that he exerted undue influence upon her or that she was susceptible to undue influence, and the record is sufficient on this, so I would affirm the trial court's ultimate decision for Stacy.

GILBERTSON, Justice (concurring in result).

I join in the court's opinion with the exception of its determination that the trial court was clearly erroneous in finding no confidential relationship existed between Margie and Stacy.

> In reviewing this matter, we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses.... In addition, we must review the facts in the light most favorable to the findings of the trial court and all conflicts in the evidence must be resolved in its favor.

*In re Estate of Borsch,* 353 N.W.2d 346, 348 (S.D.1984). *See also In re Estate of Till,* 458 N.W.2d 521, 523 (S.D.1990).

In arriving at its ultimate conclusion of no undue influence, the trial court entered thirty-three pages of findings of facts, much of it single-spaced. Upon the facts relevant to the issue of a confidential relationship, the trial court found:

> On the issue of whether there was a confidential relationship between Stacy and Margie, on the surface the evidence certainly would support a finding that Margie had trust and confidence in the integrity and fidelity of Stacy. This was a mother-son relationship that had continued on after Stacy became an adult in that he continued to stay on the ranch and worked on the ranch. There are numerous similar mother-son relationships and there must be more to cause the relationship to rise to the level of a "confidential relationship" required under these circumstances. They did spend a reasonable amount of time together; however, the evidence shows that Margie handled the vast majority of her personal and business affairs. She kept her own checkbook, she wrote all her own checks, paid all of her own bills, han-

dled all of her own banking, negotiated for herself on the potential lease or sale of her farmground, negotiated for herself on the price of the cattle shed she built, decided when she would go to Rapid City to put winter tires on her car in the fall and when to have the oil changed on her car. The cattle were normally sold at the same time, however, Margie decided when she sold her wheat. Margie decided on her own and proceeded to obtain supplemental medical insurance to medicare for herself. She cooked a majority of the meals of herself, bathed herself, took care of her hair, clothed herself and except for vacuuming and scrubbing floors she did her own housework. She took care of sending birthday and Christmas cards and gifts herself. In addition, the evidence shows that Margie rarely sought Stacy's advice. She discussed her thoughts about leaving the ranch to Stacy with Jim Madsen, Don Madsen, Ellen Madsen and Mary Ann Tropple, but not Stacy. When the time came where she was going to possibly lease her farmground, she called neighbors, Don Madsen, Ross and Serena and Jim Madsen, rather than consult with Stacy about it. Considering the totality of the evidence in this case, the Court concludes there was not a relationship between Margie and Stacy that rises to the level of the required confidential relationship.

This court has generally defined a confidential relationship as arising when a decedent places trust and confidence in the integrity and fidelity of another. *In re Estate of Weickum*, 317 N.W.2d 142, 145 (S.D.1982). Clearly such concepts as trust and confidence are not bright line determinations but exist in matters of degree based on the facts of each case. As noted by the majority, in *Till*, 458 N.W.2d at 524, we held that when determining the issue of a confidential relationship, the trial court can consider such factors as the amount of time the beneficiary spent with the testator,[1] whether the beneficiary handled many of the testator's personal or business affairs and whether the testator ever sought the advice of the beneficiary.

However, we went on in *Till* to state that while these factors are "significant," they are not exclusive and the ultimate determination should be based on the totality of the evidence of the case as the trial court has done herein.

If a mother leaves property to a son, it will be the unusual case where there is not some degree of a confidential relationship prior to the mother's death. In rural South Dakota, similar family and business relationships as existed here are hardly unique and are probably common. However, the question more appropriately should be whether this relationship exists to a point that the law attaches to it the legal significance of the doctrine discussed herein.

The purpose of this legal doctrine is clear. It is to demand close judicial scrutiny to insure the transactions that transpired in conjunction with the confidential relationship are fair and aboveboard, *Borsch*, 353 N.W.2d at 348, where the potential heir is in a position of "dominance" over the testator. *Till*, 458 N.W.2d at 524. It is not to penalize a loving mother-son relationship.

Herein the trial court found that the facts established a loving mother-son relationship and that relationship was "fair and aboveboard" with no position of "dominance" by Stacy. The facts to support such a finding are not clearly erroneous. *Weickum*, 317 N.W.2d at 145.

KONENKAMP, J., joins this special writing.

---

1. This was a family ranch operation. Margie's husband, Dale, and son, Glen, were also actively involved in the ranch operation prior to their deaths in 1989. Thus, the relationship between Margie and Stacy as far as any purported "confidential relationship" existed only from 1989 until 1993 when Margie died.