In the Matter of the ESTATE OF Fredris
J. ELLIOTT, Deceased,

Donald P. ELLIOTT and Robert P.
Elliott, Contestants, Plaintiffs
and Appellants,

v.

Raymond D. ELLIOTT, Defendant
and Appellee.

No. 18972.

Supreme Court of South Dakota.

Considered on Briefs May 23, 1995.

Decided Sept. 13, 1995.

Dennis H. Hill of Costello, Porter, Hill, Heisterkamp & Bushnell, Rapid City, for contestants, plaintiffs and appellants.

Joseph M. Butler and Allen G. Nelson of Bangs, McCullen, Butler, Foye and Simmons, Rapid City, for defendant and appellee.

GILBERTSON, Justice.

Donald and Robert Elliott, contestants, appeal the circuit court's order admitting their mother's last will and testament and subsequent codicils into probate and denying their objections. We affirm.

### FACTS

Fredris J. Elliott died January 22, 1993 in Rapid City at the age of 81. She was predeceased by her husband, Harold, who died in the Rapid City flood of 1972. Fredris was survived by the couple's four sons, Robert, Donald, Raymond, and Jack.

In the 1960's, Harold Elliott established A & B Welding Supply Co. in Rapid City and purchased Dakota Welding Supply Co., now located in Watertown, Huron, and Sioux Falls. Both Robert and Donald were involved in these welding businesses with their father. Jack managed the Watertown operation for a short time but ultimately sold his stock back to the company and moved out of state to start similar businesses. Raymond was not involved with the business.

When Harold died in 1972, his will gave sufficient stock to Donald so that Donald and Robert would hold equal shares to A & B Welding and Dakota Welding. The balance of Harold's stock in both companies was to be held in trust with income for life to his widow, Fredris, and the remaining corpus distributed equally among their four sons on her death. However, since the welding companies were Subchapter S corporations, the stock could not legally be held in trust; in 1973 all four sons agreed to transfer the stock to Fredris and terminate the trust. In order to induce Jack to agree, Donald agreed to return certain stock and dividends in the businesses, the shares that would give him an equal share with Robert, to Fredris.

Fredris was an active participant in the family's welding businesses and the stockholders' meetings almost up until her death. Donald testified that even when his mother could not attend meetings, Robert or Donald took the minutes to her and explained the events and she signed the minutes. Even in her last days, she handled her own financial affairs with some assistance from friends and relatives.

A 1977 will divided Fredris' estate equally among her four sons. It also contained a repurchase agreement which allowed Donald and Robert to buy Fredris' stock in A & B Welding and Dakota Welding, paying for it over time. In 1989, Fredris revised her will effectively disinheriting Donald and Robert. A 1991 codicil replaced Robert as executor of the will with Jack and Raymond as co-executors. A 1992 codicil removed Jack and named Raymond as sole executor and deleted a provision of the 1989 will which would have cancelled all debts owed to Fredris by her children.

Donald and Robert objected to the revised will and codicils claiming undue influence was exerted upon Fredris by both Jack and Raymond causing her to disinherit Donald and

Robert from her estate. The circuit court found no evidence of undue influence and admitted the will and codicils into probate. Donald and Robert appeal the circuit court's decision.

### STANDARD OF REVIEW

SDCL 29–2–5 provides: "A will or part of a will procured to be made by duress, menace, fraud, or undue influence, may be denied probate; and a revocation procured by the same means may be declared void." SDCL 29–2–5, *repealed* 1995 S.D.Sess.L. ch. 167, § 96.[1] SDCL 30–6–18 provides the following:

> Issues of fact raised ... and involving any of the following matters must be tried and determined by the court:
>
> (1) The competency of the decedent to make a last will and testament;
>
> (2) The freedom of the decedent at the time of the execution of the will from duress, menace, fraud, or undue influence;
>
> (3) The due execution and attestation of the will by the decedent and subscribing witnesses; or
>
> (4) Any other questions substantially affecting the validity of the will.

SDCL 30–6–18, *repealed* 1995 S.D.Sess.L. ch. 167, § 149.[2]

This court will not set aside a trial court's findings of fact unless clearly erroneous. SDCL 15–6–52(a); *In re Estate of Till,* 458 N.W.2d 521, 523 (S.D.1990); *In re Estate of Weickum,* 317 N.W.2d 142, 145 (S.D.1982); *In re Estate of Hobelsberger,* 85 S.D. 282, 289, 181 N.W.2d 455, 458 (1970). A finding is clearly erroneous if, after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been made by the trial court. *Till,* 458 N.W.2d at 523; *In re Estate of Pierce,* 299 N.W.2d 816, 818–19 (S.D.1980); *In re Estate of Shabley,* 85 S.D. 692, 695, 189 N.W.2d 460, 461 (1971).

Additionally, all conflicts in the evidence must be resolved in favor of the trial court's findings. *In re Estate of Gibbs,* 490 N.W.2d 504, 507 (S.D.1992); *Till,* 458 N.W.2d at 523; *In re Estate of Metz,* 78 S.D. 212, 214, 100 N.W.2d 393, 394 (1960). The credibility of the witnesses, the weight to be accorded their testimony, and the weight of the evidence must be determined by the trial court and we give due regard to the trial court's opportunity to observe the witnesses and the evidence. *Gibbs,* 490 N.W.2d at 507; *Weickum,* 317 N.W.2d at 145.

Donald and Robert urge this court to apply a de novo, rather than a clearly erroneous, standard of review when reviewing deposition and documentary evidence. We recently addressed this issue in *First National Bank v. Bank of Lemmon,* 535 N.W.2d 866 (S.D.1995). In that case, we held, on the standard of review issue, that "when reviewing findings based on documentary evidence we do not apply the clearly erroneous rule ... but review the matter de novo." *Id.* at 871. Hereinafter, we review live testimony under the clearly erroneous standard and deposition and documentary evidence under the de novo standard of review.

### ANALYSIS AND DECISION

There is but one issue before this court for review: was the testatrix a victim of undue influence? For influence to be undue it must be of such a character as to destroy the free agency of the testatrix and substitute the will of another for that of the testatrix. *Pierce,* 299 N.W.2d at 819. Donald and Robert argue their mother's 1989 will and 1991 and 1992 codicils were the result of undue influence by brothers Raymond and Jack and that the trial court erred in its conclusion to the contrary.[3] Our settled law requires will contestants to prove, by a preponderance of evidence, four elements to establish the existence of undue influence. "These elements include: (1) decedent's susceptibility to undue influence; (2) opportuni-

---

1. The repeal of this statute applies only where the testator dies on or after July 1, 1995.

2. The repeal of this statute applies only where the testator dies on or after July 1, 1995.

3. At trial Donald testified he did not believe Raymond exercised undue influence on the 1989 will. This constitutes an admission against interest by one of the will contestants. *See Egemo v. Flores,* 470 N.W.2d 817, 826 (S.D.1991) (Sabers, J., dissenting).

ty to exert such influence and effect the wrongful purpose; (3) a disposition to do so for an improper purpose; and (4) a result clearly showing the effects of undue influence." *Till,* 458 N.W.2d at 525 (citing *Pierce,* 299 N.W.2d at 819–20; *Metz,* 100 N.W.2d at 394; *In re Rowlands' Estate,* 70 S.D. 419, 426, 18 N.W.2d 290, 293 (1945)).

 However, if will contestants can establish the existence of a confidential relationship between the testatrix and the beneficiary under the contested will, the burden of going forward with the evidence shifts to the beneficiary to show that he took no unfair advantage of his dominant position. *Till,* 458 N.W.2d at 523. "[A] confidential relationship exists whenever a decedent places trust and confidence in the integrity and fidelity of another." *Id.* at 524. We consider the following factors to be significant, although not exclusive, in determining whether a confidential relationship existed between the testatrix and a beneficiary: (1) the amount of time the beneficiary spent with the testatrix; (2) whether the beneficiary handled many of the testatrix's personal or business affairs; and (3) whether the testatrix sought the advice of the beneficiary. *Id.* (citations omitted).

 "The mere existence of such a relationship does not automatically raise a presumption of undue influence, however, 'unless the beneficiary actively participated in the preparation and execution of the will and unduly profited therein.'" *In re Estate of Borsch,* 353 N.W.2d 346, 348 (S.D.1984) (quoting *Weickum,* 317 N.W.2d at 145 and citing *In re Estate of Anders,* 88 S.D. 631, 226 N.W.2d 170 (1975)). The existence of a confidential relationship, in and of itself, does not create a presumption of undue influence, although it may demand the relationship be examined with close judicial scrutiny to insure the transactions that transpired in conjunction with the confidential relationship are fair and aboveboard. *Id.* (citing *In re Heer's Estate,* 316 N.W.2d 806, 810 (S.D.1982)).

 The trial court found that while all four of Fredris' sons had, at one time or another, a relationship of a confidential nature with their mother, these relationships did not rise to the level to which this court attaches legal significance. This finding is not clearly erroneous. The beneficiaries under the 1989 will, Jack and Raymond, did not actively participate in its preparation and execution as was testified to by Fredris' attorney. Furthermore, the trial court found that Raymond had very limited contact with his mother from 1985 until July 1992 and that during this time period, he and his mother did not have a good relationship. Also, while the record reflects Fredris may have sought advice from any one of her sons (or any one else) from time to time, she ultimately made up her own mind and did whatever she wished. Thus, there exists no presumption of undue influence, and contestants must prove all four elements by a preponderance of the evidence.

 The first element to be proved in an undue influence claim is the testatrix's susceptibility to undue influence. Contestants fail to meet this first element. We therefore deem it unnecessary to discuss in detail evidence they argue demonstrates that Raymond and Jack had the opportunity to exert influence upon decedent and the disposition to do so for an improper purpose, and that the will showed the results of such undue influence. *See Weickum,* 317 N.W.2d at 146; *In re Estate of Landeen,* 264 N.W.2d 521, 523 (S.D.1978). The trial court found Donald and Robert failed to prove any of the four elements of undue influence. Moreover, the court found Fredris' decision to revise her will in 1989 was the result of actions taken by Donald and Robert earlier that year with which Fredris disagreed, and not the result of any undue influence by Raymond and Jack.

Fredris and her four sons had what can only be described as a contentious relationship from the early 1980's on, and perhaps starting even earlier.[4] The trial court heard testimony from more than one witness that Fredris would have "favorites" among her sons and the favorites would change at vari-

---

**4.** This is not to say there was not also evidence in the record of the sons' love and genuine concern for their mother.

ous times.[5] The record also reflected that Fredris made substantial gifts and loans to all four of her sons, their wives, and their children throughout her lifetime.[6] Fredris also loaned money to both A & B Welding and Dakota Welding on a number of occasions whenever the companies needed it. Despite such generosity, or perhaps because of it, there appears to have been almost constant bickering among the four families regarding who had gotten what from Fredris, to the point where some family members were not speaking. As a result, much of the communication over the years was through letters to and from the brothers and to Fredris that were full of accusations and demands. Testimony from Fredris' granddaughter (Donald's daughter), in whom Fredris confided and had a close relationship before a falling out in 1989, revealed Fredris was "deliberately manipulative" and "never had the same conversation with one person that she had with another." A similar observation was made by Jack in a letter to his mother which was introduced at trial. Fredris' long-time friend and neighbor described her as a very controlling and manipulative person with a strong will who would distance herself from those she could not control. Fredris' friend further testified Fredris could not be easily influenced.

Although the record reveals numerous disputes between members of this family over the years, certain events clearly appear to have impacted Fredris' decision to change her 1977 will. Up until August 1989, Fredris derived $2500 monthly rental income from the ownership and lease back to the welding businesses of one thousand compressed gas cylinders. Other family members also owned cylinders and derived income under a similar arrangement. In 1987, Fredris received a letter from Robert stating this cylinder lease arrangement would continue for life. Two years later, Robert wrote to Fredris telling her Dakota Welding and A & B Welding intended to buy her cylinders, thus effectively cutting off this monthly income. Although he also told her Dakota Welding would be sold and hers were the last cylinders to buy back, neither was true then or is true today. It was undisputed this was against Fredris' wishes and against Robert's earlier promise that she would maintain ownership and the lease arrangement for her lifetime. The record reflected, through testimony from a number of witnesses, that Fredris was upset about Robert's buying back the cylinders.

Also during this time period, Fredris lived in a condo purchased with $30,000 of her money and $33,000 of Donald's. Donald put the condo's title in his and his wife's name and arranged with Fredris that he would pay all the condo's monthly expenses except for the association's fee, for which Fredris would be responsible. This monthly fee was paid to Donald in the form of "rent," and Fredris paid Donald $400 per month. Donald testified he would then pay the condo association and give his mother back the difference in cash.[7] Donald remodeled the kitchen when Fredris was in Phoenix one year, although she was not aware of the plan to remodel nor did she desire it. In 1987, Fredris told Jack she didn't think she owned the condo but that Donald owned it and asked Jack if he would talk to Donald about it. Jack informed Donald that Fredris was questioning the condo ownership. By March 1989, Don-

---

5. We note the trial judge observed at the end of trial:

My feeling is that she passed away at a given point in time, had it been earlier or later, depending on who was currently on top of the letter-writing campaign that seemed to be waged by three of the brothers excessively and to some extent all four brothers, we may have had a different outcome here. That doesn't go to her testamentary capacity, however, and it does not make her incompetent.

The contestants seize upon this comment as establishing undue influence. Herein, this veteran trial judge went the extra mile and read all the depositions and the entire court file prior to the trial on the admission of the will. The trial court

entered seventeen pages of findings of fact and conclusions of law determining there was no undue influence. This statement, taken out of context, is not a basis for this court to rule to the contrary.

6. The testimony revealed Fredris was acutely aware of the IRS, regulations and exactly how much money she could give to relatives during the year to reduce her taxable estate.

7. Donald testified he was giving his mother back $200 in cash in the beginning, but this figure dropped to $150 per month after the association raised its fees.

ald transferred the deed from himself and his wife to Fredris. This was done, however, only after Jack agreed to drop his earlier agreement with Donald under which Donald was to give back to his mother stock he received under his father's will which gave Donald a share of the welding businesses equal to Robert's share.

Fredris spoke to Jack in 1989 about wanting to make a will but not knowing who to see about doing so. Jack suggested the name of an attorney the family knew while the boys were growing up and called this attorney. This first attorney stated he knew the family too well and suggested other attorneys. Fredris met with a few of these attorneys and told Jack she thought they were too young. Eventually, Fredris contacted Verne Thorstenson on her own and he prepared and executed her will. Prior to this time, Fredris told Jack she intended to disinherit Robert and Donald. According to Jack's testimony, he advised against this, telling Fredris it would only cause friction in the family. He also made a list of suggestions for Fredris to consider when revising her will. When Fredris later gave Jack a copy of her will, he looked it over and found she had rejected his advice.[8] It is significant that Mr. Thorstenson testified he had not seen Jack's notes regarding the disposition of Fredris' property and was not contacted by him with reference to the will until after its execution.

The testimony from various family members reflects that Fredris had a falling out with sons Donald and Robert in 1989, over the handling of the condo by Donald and the cylinders by Robert, and that shortly thereafter she revised her will disinheriting them both. Her revised will explicitly stated they were disinherited and that she believed they had been provided for during her lifetime.[9] It is undisputed that two or three years prior to her 1993 death, Fredris told Robert that

he and Donald had been the "two biggest disappointments" of her life.

■ The 1989 will also cancelled all debts owed Fredris by her children; Raymond and Jack would have benefitted from this provision. However, the 1992 codicil ratified the will and removed the debt forgiveness provision. This final codicil is clearly adverse to the interests of Raymond and Jack, the two brothers accused of undue influence here. Jack testified at trial that he owed his mother approximately $194,500 at the time of her death. The record reflects Raymond owed his mother nearly $270,000. Although we affirm the trial court's finding of no undue influence in the will, we note that when a subsequent codicil republishes the prior will, any taint in the earlier will from undue influence is removed if there is no evidence of undue influence at the time of the subsequent codicil. *Abel v. Bittner*, 470 N.W.2d 348, 350 (Iowa 1991); 79 Am.Jur.2d *Wills* § 698, at 778 (1975); 94 C.J.S. *Wills* § 234, at 1084 (1956).

The physical and mental strength of a testator is material regarding the question of the testator's susceptibility to undue influence and fraud. *Weickum*, 317 N.W.2d at 145; *Shabley*, 189 N.W.2d 460. We note that even when Fredris suffered some health problems and was living in a nursing home, her ability to understand her options and exercise them was substantially unaffected. The record reflects Fredris had a strong and long-standing aversion to nursing homes. When placed in one, she arranged for her own dismissal from that facility by refusing to pay her bills there. She correctly surmised the nursing home would evict her, which it did, and she returned home to her condo.[10] Further evidence of Fredris' "mental strength" and independence was offered by Donald Elliott and by Fredris' attorney, Mr. Thorstenson, both of whom testified Fredris was of sound mind and competent at all

---

8. Fredris, in fact, had rejected all of Jack's suggestions save one, that being forgiveness of all debts to her children. This provision was subsequently deleted by Fredris in the 1992 codicil.

9. In fact, Mr. Thorstenson testified Fredris told him Donald and Robert had been "the recipients of a couple of businesses" which were successful

and further informed him she felt that was adequate for purposes of her estate distribution.

10. None of Fredris' sons were even aware of this event until a cousin called one of them from the front desk of the nursing home to inform him his mother was checking herself out.

relevant times. Robert Elliott testified during deposition his mother knew every penny she had even up until her death and that she was "sharp in numbers." The trial court found that "Fredris Elliott had a mind of her own and a strong will."

The trial judge pronounced this a "classic case of a family business that ended up running the family and, in fact, pretty much seems to have ruined a family relationship." Following our review of the record in this case, we agree. Fredris clearly was upset by actions taken by Donald and Robert in 1989 which caused her to revise her will shortly thereafter. She discussed her dissatisfaction with almost anyone who would listen, including her attorney, who prepared and executed her will according to her wishes. As other of her sons fell into disfavor, Fredris removed or added their names as executors in the 1991 and 1992 codicils. She also deleted a provision regarding debt forgiveness which was actually adverse to the interests of the two brothers accused of undue influence here. Finally, we note that although Robert urged his mother by letter in September 1992 to sell her stock and make out a new will so that all four sons shared equally, and offered his help in doing so, she did not.

We have previously stated: " 'A testator has the privilege and right to dispose of his property as he chooses within limits and in the manner fixed by statute. The law does not require that he recognize his relatives equally or at all.' " *Weickum*, 317 N.W.2d at 146 (quoting *In re Blake's Estate*, 81 S.D. 391, 398, 136 N.W.2d 242, 246 (1965)); *see also In re Estate of Zech*, 285 N.W.2d 236 (S.D.1979). Fredris Elliott disposed of her property exactly as she pleased as was her privilege and right. We find the court's decision to admit the will and codicils into probate was not clearly erroneous and, therefore, we affirm.

MILLER, C.J., and SABERS, AMUNDSON and KONENKAMP, JJ., concur.