1998 SD 15

**In the Matter of the ESTATE OF Paul H. LONG, Deceased.**

**Marvin L.R. LONG, Sarah McCully, Cindy Smith, Shawn Keyes, Jerome Long, Pix–Ann Walker, Kurt D. Long, Kevin A. Long, Michael L.R. Long, Montgomery R. Long, Plaintiffs and Appellants,**

**v.**

**Elton C. LONG and Patricia A. Walker, Defendants and Appellees.**

Nos. 20066, 20067.

Supreme Court of South Dakota.

Considered on Briefs Jan. 13, 1998.

Decided Feb. 18, 1998.

Thomas P. Tonner of Tonner, Tobin and King, Aberdeen, for plaintiffs and appellants.

William D. Gerdes of Williams, Gellhaus & Gerdes, Aberdeen, for defendants and appellees.

MILLER, Chief Justice.

[¶ 1.] Paul H. Long died on August 9, 1996. Two wills, one from 1984 and another from 1996, were offered for probate. The circuit court held that Paul lacked testamentary capacity when he executed the 1996 will and that the 1984 will was presumed revoked because its original could not be found. The circuit court thus determined that Paul died intestate. Both parties appeal. We affirm.

## FACTS

[¶ 2.] Paul ran a farming operation in Faulk County, South Dakota, for many years. He was married twice and divorced his second wife in 1984. He had six children and several grandchildren. During the period between 1976 through 1984, he executed at least eight wills. The last of these was executed on September 18, 1984, at the office of attorney Jarvis Brown. Brown retained a copy of the will and gave the original to Paul. Brown never saw the original again.

[¶ 3.] On July 27, 1995, a hearing was held to determine Paul's competency. A conservatorship was established and Paul's son, Marvin Long, was appointed as his guardian. In August, 1995, Paul was diagnosed as suffering from dementia of the Alzheimer's type.

[¶ 4.] In September, 1995, Paul's daughter, Patricia Walker, filed a petition to remove Marvin as guardian. She wanted to be appointed guardian of her father. Marvin did not object to this petition and Paul then went to live with Patricia. In May of 1996, Patricia drafted a will for Paul. She then took Paul to a local bank where the will was witnessed by two bank employees. It was later filed in the county courthouse.

[¶ 5.] Paul died in August, 1996. Two of his children, Patricia and Elton Long (hereinafter Walker), petitioned for probate of the 1996 will drafted by Patricia. An opposition to probate of the will was filed by Paul's son Marvin and Paul's grandchildren Cindy Smith, Sarah McCully, Shawn Keyes, Jerome Long, Pix–Ann Walker, Kurt Long, Kevin Long, Michael Long, and Montgomery Long (hereinafter Smith). Smith also sought probate of Paul's 1984 will.

[¶ 6.] The trial court ruled that the 1996 will failed because Paul lacked testamentary capacity at the time it was executed. The trial court also decided the 1984 will was lost and there was insufficient evidence to rebut the presumption it had been revoked. Thus, Paul was declared to have died intestate.

[¶ 7.] Smith raises the following issue:

> Did the trial court err when it determined there was insufficient evidence to rebut the presumption that the 1984 will had been revoked?

[¶ 8.] By notice of review, Walker argues the following issue:

> Did the trial court err when it determined that the 1996 will failed because of a lack of testamentary capacity?

## STANDARD OF REVIEW

[¶ 9.] We review a trial court's finding that a lost will has been revoked under the clearly erroneous standard. *In re Estate of Modde*, 323 N.W.2d 895, 898 (S.D.1982). Likewise, we review a trial court's findings as to testamentary capacity under the clearly erroneous standard. *In re Guardianship*

*and Conservatorship of Lanning,* 1997 SD 81, ¶ 9, 565 N.W.2d 794, 795. We give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.*

> Under the clearly erroneous standard, the question for this Court is not whether we would have made the same findings that the trial court did, but, whether on the entire evidence, we are left with a definite and firm conviction that a mistake has been committed. That this Court may have found the facts differently had we heard the testimony is no warrant for us to substitute our judgment for the trial court's carefully considered findings.

*Id.,* 1997 SD 81 at ¶ 9, 565 N.W.2d at 796 (citations and internal quotation omitted).

## DECISION

**[¶ 10.] I. Whether the trial court erred in finding the 1984 will had been revoked.**

▬ [¶ 11.] Smith argues the trial court erred in determining Paul's 1984 will had been revoked because, even though the original will could not be found, there was sufficient evidence to rebut the presumption that it had been revoked. We disagree.

▬ 12.] Smith points to SDCL 30–6–27 as the applicable law in this state. Smith is incorrect in doing so, as that statute is no longer in effect. The Uniform Probate Code (UPC) under Title 29A of our code now governs probate proceedings. The UPC applies to decedents dying on or after July 1, 1995. SDCL 29A–8–101(b)(1); *see also Estate of Jetter,* 1997 SD 125, ¶ 10 n.1, 570 N.W.2d 26, 28 n.1. Since Paul died in August of 1996, the UPC and its provisions are applicable here.

[¶ 13.] SDCL 30–6–27 previously governed lost or destroyed wills.[1] The only reference to lost or destroyed wills under the UPC is found in SDCL 29A–3–402, which provides in part:

> (c) If the original will is neither in the possession of the court nor accompanies

the petition and no certified copy of a will probated in another jurisdiction accompanies the petition, the petition also must state the contents of the will, and indicate that it is lost, destroyed, or otherwise unavailable.

> (d) If the original will, or certified copy of the will as probated in another jurisdiction, is not available, the contents of the will can be proved by a copy of the will and the testimony or affidavit of at least one credible witness that the copy is a true copy of the original, and the will may be admitted to probate if the court is reasonably satisfied that the will was not revoked by the testator. If a copy of the will is not available, the contents of the will can be proved only by clear and convincing proof, and the court shall enter an order setting forth the contents and the names of the witnesses.

[¶ 14.] The contents of the 1984 will are not disputed. The parties are only arguing over whether or not the will had been revoked. While SDCL 30–6–27 provided the means by which a lost will could be proved, no such requirements or provisions are found in the current version of the UPC. However, the presumption that a lost will has been revoked still remains and, as such, is a matter of substantive law governing revocation of wills. SDCL 30–6–27 was a procedural law governing the probate of lost or destroyed wills. *See In re Estate of Hartman,* 172 Mont. 225, 563 P.2d 569, 572 (1977); *see also Modde,* 323 N.W.2d at 898 (holding that, "The failure to find a will after a careful and exhaustive search raises a presumption that the testator destroyed it with the intent to revoke it.") (citation omitted). The fact that the presumption still exists can also be seen in the express language of SDCL 29A–3–402(d), which states: "[T]he will may be admitted to probate if the court is reasonably satisfied that the will was not revoked by the testator." Thus, proof must be provided to the trial court to "reasonably satisfy" it that the will was not revoked.

---

1. SDCL 30–6–27 provided: "No will shall be proved as a lost or destroyed will, unless the same is proved to have been in existence at the time of the death of the testator, or is shown to have been fraudulently destroyed in the lifetime of the testator, nor unless its provisions are clearly and distinctly proved by at least two credible witnesses."

[¶ 15.] As mentioned, under SDCL 30–6–27 there were two methods by which a proponent of a lost will could rebut the presumption that the will had been revoked. Those methods were either by proving the existence of the will at the time of the death of the testator, or by showing that the will was fraudulently destroyed during the life of the testator. Under the UPC, there are no such express limitations as to what needs to be proved to rebut the presumption. *See Hartman*, 563 P.2d at 574. The only requirement is that, given all the evidence, the trial court must be "reasonably satisfied" that the will was not revoked. In this case, the trial court obviously was not "reasonably satisfied" that the will was not revoked.

[¶ 16.] To rebut the presumption that the will was revoked, Smith points to the testimony of many witnesses who stated that Paul wanted his estate to go to his grandchildren and that is why he executed the 1984 will.[2] There was also testimony that Paul wanted to leave more to the grandchildren because he was angry with his children in 1983 or 1984. One of Paul's grandchildren also testified that on different occasions from 1983 to 1989 Paul had told him that the grandchildren were in his estate. Finally, Smith also alleges that since Patricia and Elton had access to Paul's papers, and they also had adverse interests to the 1984 will, such is evidence to indicate the will was not revoked by Paul, but rather was somehow disposed of by them.

[¶ 17.] However, there was also evidence presented to the trial court to indicate that Paul did revoke his 1984 will. After a thorough and exhaustive search by many different persons through Paul's papers and safe deposit box, wills from the years 1978, 1979, 1981, and 1983 were found among his personal possessions, but the 1984 will was never found. He was also prone to changing his will many times during his life, because he did not always get along with certain members of his family.

[¶ 18.] While there was testimony that Paul wanted to include his grandchildren in his estate, that testimony only covered a period of time up until the late 1980s. There was also testimony that sometime in the early 1990s Paul had said he had changed his will, or was going to change his will, and that he was going to give it all to his kids and "let them fight it out." There was further testimony from Patricia that Paul told her in 1993 that he did not have a will and that he wanted to see his kids fight over his property. In *Modde*, we held the absence of any statement by the decedent of an intent or desire to revoke or change a will was significant to the trial court's finding that the will had not been revoked. 323 N.W.2d at 899. Here, Paul told two different persons that he wanted to change his will or that he did not have a will. Any statements by Paul that he desired to leave his estate to his grandchildren seemed to have occurred before these later statements. No evidence was presented to indicate otherwise. Given the trial court's ability to judge the credibility of the witnesses, we hold the trial court was not clearly erroneous in finding Smith failed to rebut the presumption that the 1984 will had been revoked.

[¶ 19.] **II. Whether the trial court erred in determining the 1996 will failed because Paul lacked testamentary capacity.**

 [¶ 20.] Walker argues the trial court erred in determining that Paul lacked testamentary capacity when he executed the 1996 will. We disagree.

[¶ 21.] SDCL 29A–2–501 provides that "[a]n individual eighteen or more years of age who is of sound mind may make a will." Sound mind, for purposes of testamentary capacity, has been defined as:

"One has a sound mind, for the purposes of making a will, if, *without prompting*, he is able 'to comprehend the nature and extent of his property, the persons who are the natural objects of his bounty and the disposition that he desires to make of such property.' *In re Estate of Podgursky*, 271 N.W.2d 52, 55 (S.D.1978). Soundness of

---

**2.** The 1984 will provided that the property in Paul's estate was to be divided equally between his children and grandchildren, except that Mark Long was disinherited. The 1996 will divided the property evenly between the children, and there was no provision for the grandchildren.

mind, for the purpose of executing a will, does not mean 'that degree of intellectual vigor which one has in youth or that is usually enjoyed by one in perfect health.' *Petterson v. Imbsen,* 46 S.D. 540, 546, 194 N.W. 842, 844 (1923). Mere physical weakness is not determinative of the soundness of mind, *In re Estate of Anders,* 88 S.D. 631, 636, 226 N.W.2d 170, 173 (1975); and it is not necessary that a person desiring to make a will 'should have sufficient capacity to make contracts and do business generally nor to engage in complex and intricate business matters.' *Petterson,* 46 S.D. at 546, 194 N.W. at 844."

*Lanning,* 1997 SD 81, ¶ 11, 565 N.W.2d at 796 (quoting *In re Estate of Burk,* 468 N.W.2d 407, 409 (S.D.1991)) (emphasis in original) (other citation omitted).

◼ [¶ 22.] The fact that a guardian has been appointed to take care of a testator's estate does not, by itself, invalidate a will because of lack of testamentary capacity. *In re Estate of Hastings,* 347 N.W.2d 347, 350 (S.D.1984). Also, the fact that a testator is ill or suffering from a disease does not necessarily prevent that testator from possessing testamentary capacity. *In re Estate of Linnell,* 388 N.W.2d 881, 884 (S.D.1986).

◼ [¶ 23.] Testamentary capacity is not determined by any single moment in time, but must be considered as to the condition of the testator's mind a reasonable length of time before and after the will is executed. *Lanning,* 1997 SD 81, ¶ 11, 565 N.W.2d at 796 (citing *In re Estate of Nelson,* 330 N.W.2d 151, 155 (S.D.1983)).

[¶ 24.] Given the trial court's ability to judge the credibility of the witnesses, we cannot say that it was clearly erroneous. While the facts that Paul had a guardian and he suffered from dementia of the Alzheimer's type were not dispositive of the issue, they are helpful. The trial court asked Dr. Matushin, Paul's physician, if Paul was able to understand all of his relatives and his property and determine where that property

should go. Dr. Matushin responded that Paul was unable to do so.[3]

[¶ 25.] There was also testimony from Paul's granddaughters that he did not remember or recognize them in May of 1996. There was testimony from Shirley Holt who managed the hotel Paul lived in for twenty years that he was confused and that he had gotten worse in the last few years. Also, Paul's long-time acquaintance, Sheriff Mike Demery, testified that Paul did not know who Demery was on different occasions and that Paul would become confused.

◼ [¶ 26.] The proponent of a will has the burden of establishing the testamentary capacity of the testator at the time the will was executed. *In re Estate of Podgursky,* 271 N.W.2d 52, 56 (S.D.1978). Walker was unable to meet this burden and, in viewing the evidence that was before the trial court, we hold the trial court was not clearly erroneous in determining that Paul lacked the requisite testamentary capacity to execute the 1996 will.

[¶ 27.] Affirmed.

[¶ 28.] SABERS, AMUNDSON, KONENKAMP, and GILBERTSON, JJ., concur.

---

**3.** Dr. Matushin last saw Paul in September of 1995, eight months before the 1996 will was drafted in May, 1996. He also testified that he would have expected a downward progression in Paul's condition in those eight months.