2003 SD 89

**LoiS BAUN, Jerry Baun and Daniel Baun, Petitioners and Appellants,**

**v.**

**ESTATE OF Lila KRAMLICH and Evelyn M. Nelson, Trustee of the Lila Kramlich Living Trust, Respondents and Appellees.**

No. 22379.

Supreme Court of South Dakota.

Argued March 24, 2003.

Decided July 23, 2003.

H.I. King of Tonner, Tobin & King, Aberdeen, South Dakota, Attorneys for petitioners and appellants.

Kennith L. Gosch of Bantz, Gosch, Cremer, Peterson & Sommers, Aberdeen, South Dakota, Attorneys for respondents and appellees.

KONENKAMP, Justice.

[¶ 1.] This is an appeal brought by the unsuccessful contestants to the will and trust of Lila Kramlich. In trial, the contestants alleged that Lila (1) was under undue influence; (2) was not of sound mind when she executed the documents; and (3) omitted the contestants from her trust and will by mistake. The trial court held that Lila was competent when she signed the instruments. Because we conclude that the court was not clearly erroneous, we affirm.

### Background

[¶ 2.] Lila Kramlich was born on March 28, 1918. She had two siblings, a brother, Maurice Schultz, and a sister, Lois Baun. While Lila had a warm relationship with Maurice, she purportedly bore hard feelings toward Lois. Lila came

of working age during the Great Depression. When she was still quite young, she had to leave home to earn her own living. According to some family members, Lila resented that she had to go to work while her younger sister, Lois, obtained her education.

[¶ 3.] Lila married Jacob Kramlich in 1962, when she was forty-four. They had no children, but Jacob had two children from a prior marriage: Otto Kramlich and Elizabeth (Kramlich) Swanson. In 1976 Jacob passed away. In 1977, Otto, Lila's stepson, died. Lila's parents both died in 1981, and her brother, Maurice, died in 1990.

[¶ 4.] Lila was a businessperson. She lived in Eureka, South Dakota, most of her adult life. She owned drug stores in Eureka and Leola. Her brother, Maurice, was a farmer. He lived on the family farm near Revillo, South Dakota. Lila's sister, Lois, resided in Arizona, where she has lived for many years. Lila maintained a close relationship with her brother and his family. After Maurice's death, she continued a close relationship with his wife, Doreen Schultz, and her children, Quentin, Brad, and Nancy.

[¶ 5.] As the years passed, the division between Lila and Lois widened. They seldom saw each other and Lila almost never saw Lois's children or grandchild. Friction worsened from their joint ownership of farmland their parents bequeathed to them in Grant County. As tenants in common, the sisters became openly antagonistic over the renting of this land. In 1997,

to end the difficulty, Lila deeded her interest to Maurice's sons, Quentin and Brad.

[¶ 6.] Lois believes that Lila intentionally "dumped" her children, Gerald and Edward Baun, and excluded her grandchild, Daniel, to torment her. At trial, Lois testified that initially she felt that Quentin and Brad should have the opportunity to own all the Grant County land, but she would no longer agree to sell them her interest "due to [Lila's] manipulations and attitude." Lois feels that Quentin and Brad should sell their interest in the land to her for one-half the value of their interest, to "prevent Lila from having a complete win with her cruel action" against Lois. Despite these conflicts between the sisters, over the years Lila nonetheless executed several wills bequeathing her property to the sons and daughters of both her brother and sister.

[¶ 7.] In 1996, Lila began to experience health problems that required her to have dialysis. In 1997, she consulted her attorney, Max Gruenwald, about making some changes in her bequests. In April or May of 1998, she sent hand written instructions to Gruenwald to create a new pour over will and trust, effectively cutting out Lois's children as beneficiaries.[1] After two telephone conversations with Lila on May 28, 1998, concerning the details, Gruenwald drafted her new will and trust.

[¶ 8.] On June 6, 1998, Lila passed out at her home and was taken to the Eureka Hospital. The problem was caused by the clotting of her dialysis graft. Because of her need for dialysis, Lila was transferred to MedCenter One Hospital in Bismarck,

---

1. Lila's handwritten instructions provided:
  A. Skip one generation.
  B. The trust was to remain in effect until the youngest heir reaches age 21.
  C. The beneficiaries were to be: ,
    Three heirs of Quentin Schultz.
    Three heirs of Bradley Schultz.
    Heirs of Nancy Meyer.

The heirs in the will were to be cancelled.
  D. $10,000 was to go to the Eureka Reformed Church.
  E. $5,000 was to go to SPURS (Special People Use Riding Skills).
    In addition, Lila set out burial instructions and attached a detailed list of her assets.

North Dakota, under the care of Dr. Abel Tello. On June 12, 1998, Lila was diagnosed with a stroke. Although she suffered some cognitive deficits as a result, with treatment and rehabilitation her condition improved enough that she was transferred from the acute unit to the sub-acute unit (rehabilitation unit) on June 17, 1998. Significant to the later court contest, during the time of Lila's stay at Med-Center, the nurses would routinely ask her simple orientation questions. Many of the nursing notes recorded that she was disoriented and confused. By July 15, 1998, Lila's condition had improved to the point that she was discharged from the hospital to an assisted living home.

[¶ 9.] According to Dr. Tello, Lila's condition improved following her stroke. Still, she had good days and bad days, times when she was lucid and times when she was not. Her bad days occurred when she had dialysis. Lila underwent dialysis on July 13 and July 15, but not on July 14, the day she executed her will and trust. Dr. Tello recommended that Lila be transferred to assisted living because of her stroke and because he did not believe she should be traveling from Eureka to Bismarck every other day for dialysis. In deposition testimony, Dr. Tello was unable to offer an opinion on Lila's competency on July 14. He was not there on that day and his notes did not record her cognitive functioning during that time. In his opinion, the best people to testify to Lila's competency on July 14, 1998, would be those who saw her, like Marvel Harter. Dr. Tello believed that there was no medical reason to conclude that Lila would not be able to discuss the contents of her will with Delores Sieler and to know her family and the money and property she owned.

[¶ 10.] When Lila broke her arm in 1994, her good friend and neighbor, Delores Sieler, began to assist her with housework. In 1996, Sieler traveled with Lila to Bismarck for her dialysis. While Lila was hospitalized in Bismarck, Lila's neighbor, Kenneth Serr, cared for Lila's property. Lila wanted Sieler to be in charge of her property, so she contacted Gruenwald and had him prepare a durable power of attorney, naming Sieler as her attorney-in-fact. On June 29, 1998, Lila signed the power of attorney in Bismarck.

[¶ 11.] On June 30, 1998, Gruenwald mailed Lila a will and living trust drafted consistent with her written instructions and his conversations with her on May 28, 1998. The letter was sent to Lila's Eureka address and was eventually taken by Sieler to Lila in Bismarck on July 13, 1998. On the day that the will and trust were signed, July 14, Gruenwald had three telephone conversations with Lila. From those conversations, Gruenwald concluded that she knew what the will and trust were, knew that she requested them, and knew that she had to transfer assets to the trust to make it effective. Gruenwald believed Lila was "in good mental condition and was competent to sign legal documents, including a will."

[¶ 12.] Gruenwald asked Marvel Harter, Lila's social worker, to coordinate the signing of Lila's will and trust.[2] On July 14, 1998, Harter noticed a large envelope from Gruenwald in Lila's room. The envelope had been opened. Harter read the enclosed letter of instruction from Gruenwald. After she read the will and trust to Lila and Lila indicated that they were fine and did not want to make any changes, Harter arranged for another witness and a

---

**2.** Harter was employed as a medical social worker by MedCenter One Hospital. Her ed-

ucation includes a minor in psychology.

notary public to come to Lila's room. Then the will and trust were executed according to Gruenwald's written instructions. The documents were signed around 1:00 or 2:00 p.m. Other than the witnesses and the notary, no one else was present when Lila signed these documents.

[¶ 13.] The Trust allowed beneficiaries to borrow from the trust but required that the funds be paid back over a number of years. Gruenwald did not know how many years Lila wanted to allow, so he left the number of years blank. Lila chose four years and in her own handwriting inserted the number four in the trust document. She also dated and signed both the will and the trust.

[¶ 14.] Harter testified that MedCenter's policy was to consult with a psychiatrist if there were any questions of competency before they would allow a patient to sign a durable power of attorney. No such consultation was requested for Lila before she signed her power of attorney, will, or trust. After visiting with Lila, Harter believed that Lila knew and understood that she was signing her will and trust.

[¶ 15.] On July 15, 1998, when Lila was discharged from the hospital and admitted to The Chateau, an assisted living home, she noticed that her admission form incorrectly listed her marital status as single. She crossed this out and wrote "widow." She then signed and dated the form. On that same day, she was required to sign a release allowing her medical records to be sent from the hospital to the assisted living home. A nurse testified that the hospital did not allow patients to sign releases of medical information unless the administration believed that the patient was competent.

[¶ 16.] Lila's Chateau admission records show that she did well. She was alert, oriented to place and person, tried different interests, socialized with other residents and staff, and enjoyed bingo and Bible study. Between July 15 and November 3, 1998, Lila and Sieler had several conversations about her trust and will. During these conversations, Lila would exclaim, "When they find out what I did, the dust will fly." Lila also told Sieler that "She left $10,000 to the Reformed Church and $5000 to SPURS." After her stroke, Lila asked Sieler whether she was taking care of her property. She reviewed bills with Sieler, instructing her what to pay and what not to pay. For instance, Lila told Sieler not to continue some charitable giving. On August 3, 1998, Lila's sister-in-law, Doreen visited her. At that time, Lila recognized Doreen and was able to converse with her about family and friends.

[¶ 17.] Dr. Tello referred Lila to Dr. Brown, a neuropsychologist at the Q & R Clinic to determine the amount of damage caused by the stroke. Brown diagnosed her with severe dementia on August 20, 1998. Earlier on that day, however, Lila had had renal dialysis beginning at 10:50 a.m. and ending at 1:50 p.m. Nursing notes indicate that Lila was alert, oriented, calm, and cooperative.

[¶ 18.] In November 1998, Lila was admitted to St. Vincent's Care Center, a nursing home, where she resided until her death on November 9, 1999. Acting on Dr. Brown's diagnosis of severe dementia, the staff placed Lila in the Alzheimer's Unit for three days, until the nurses concluded that she did not belong there and transferred her to a private room. While Lila was in the nursing home, she told Sieler that an auctioneer had visited her and that she did not want to use him, explaining her reasons. On January 12, 1999, Lila signed another form authorizing the release of her medical records to the Transport Life Insurance Company and

authorized direct payment to the Q & R Clinic.[3]

[¶ 19.] Lois Baun, Gerald Baun and Daniel Baun (collectively "the contestants") objected to Lila's will and trust, contending that (1) the documents were executed under undue influence, (2) Lila was not of sound mind when she executed them, and (3) she omitted the contestants from her trust and will by mistake. At trial, two mental health experts testified: Dr. Brown by deposition and Dr. Manlove by live testimony. Dr. Brown opined that Lila was not competent and Dr. Manlove opined that Lila was competent at the time the will and trust were executed. At the end of the trial, with the other issues having been abandoned, the only question remaining was whether Lila was competent when she signed the instruments. After "considering the totality of all the evidence" the circuit court found "that [Lila's] will and trust was a result not of a spontaneous decision but a long thought out plan and that she knew what she was doing, her heirs and the extent of her property." The circuit court concluded that she was competent.

[¶ 20.] The contestants appeal on the following issue: whether the trial court was clearly erroneous in concluding that Lila possessed the testamentary capacity necessary to execute her will and trust on July 14, 1998.

### Standard of Review

[¶ 21.] We review a trial court's fact findings on testamentary capacity under the clearly erroneous standard. *In re Estate of Dokken,* 2000 SD 9, ¶ 10, 604 N.W.2d 487, 490 (citations omitted). No findings will be set aside unless they are clearly erroneous. SDCL 15–6–52(a); *Matter of Estate of Elliott,* 537 N.W.2d

660, 662 (S.D.1995). A finding is clearly erroneous if, after reviewing the entire record, we are left with the definite and firm conviction that a mistake has been made. *Id.* (citations omitted). All conflicts in the evidence must be resolved in favor of the trial court's determinations. *Matter of Estate of Till,* 458 N.W.2d 521, 523 (S.D.1990). The credibility of the witnesses, the import to be accorded their testimony, and the weight of the evidence must be determined by the trial court, and we give due regard to the trial court's opportunity to observe the witnesses and examine the evidence. *Elliott,* 537 N.W.2d at 662. That we may have found the facts differently had we heard the testimony is no warrant for us to substitute our judgment for the trial court's findings. *Matter of Estate of Long,* 1998 SD 15, ¶ 9, 575 N.W.2d 254, 256. Lastly, the contestants have the ultimate burden of persuasion on the issue of competency. SDCL 29A–3–407.

### Analysis and Decision

[¶ 22.] Adults possess testamentary capacity when they are of sound mind. SDCL 29A–2–501 provides: "[a]n individual eighteen or more years of age who is of sound mind may make a will." In *Dokken,* we used the following definition:

One has a sound mind, for the purposes of making a will, if, *without prompting,* he is able "to comprehend the nature and extent of his property, the persons who are the natural objects of his bounty and the disposition that he desires to make of such property." Soundness of mind, for the purposes of executing a will, does not mean "that degree of intellectual vigor which one has in youth or that is usually enjoyed by one in perfect health." Mere physical weakness is not

---

**3.** Dr. Tello acknowledged that this was a contractual arrangement and that the Q & R Clinic felt that Lila was competent to enter into that contractual arrangement.

determinative of the soundness of mind, and it is not necessary that a person desiring to make a will "should have sufficient capacity to make contracts and do business generally nor to engage in complex and intricate business matters." *Dokken,* 2000 SD 9 at ¶ 13, 604 N.W.2d at 491 (citing *Long,* 1998 SD 15 at ¶¶ 20–23, 575 N.W.2d at 257–58) (emphasis in original) (citations omitted).

[¶ 23.] The contestants argue that a reasonable method to determine Lila's testamentary capacity is to examine her mental status one month before and one month after the instruments were signed on July 14, 1998. They wish us to single out two events during which Lila's mental status was open to question. Testamentary capacity cannot be ascertained in any single moment of time, but must be determined by examining the condition of a person's mind over a reasonable time before and after the will was executed. *Long,* 1998 SD 15 at ¶ 23, 575 N.W.2d at 258 (citing *Guardianship and Conservatorship of Lanning,* 1997 SD 81, ¶ 11, 565 N.W.2d at 796 (citing *In re Estate of Nelson,* 330 N.W.2d 151, 155 (S.D.1983))).

[¶ 24.] The contestants also contend that expert opinion, and in particular the opinion of their expert, Dr. Brown, should be given more weight than either the lay witness testimony or the opinion of the estate's expert who had no opportunity to personally interview Lila. Lila was initially referred to Dr. Brown, a neuropsychologist, by Dr. Tello to determine the degree of damage caused by her stroke. Dr. Brown noted that Lila was confused because she could not name her heirs. Although Dr. Brown did in fact personally interview Lila, the trial court found, that he "did not know of Lila's poor eyesight nor that she had just had renal dialysis." She was at her worst on the days she received dialysis. These physical impairments could have distorted the testing.[4] Nevertheless, Dr. Brown diagnosed Lila with severe dementia on August 20, 1998, and opined that a significant degree of dementia would have existed before August 20, 1998. The nurses, on the other hand, after having observed Lila over a period of days, felt the diagnosis was erroneous and moved Lila into a private room. Yet, even if the trial court should have given greater weight to Dr. Brown's opinion, as the contestants insist, people may lack mental capacity to such an extent that according to medical opinion they are of unsound mind, but nevertheless they may still retain sufficient mental capacity to execute a will. *Matter of Podgursky's Estate,* 271 N.W.2d 52, 57 (S.D.1978) (citing *Keely v. Moore,* 196 U.S. 38, 25 S.Ct. 169, 49 L.Ed. 376 (1904)).

[¶ 25.] In contrast, Dr. Manlove, the estate's expert, a forensic psychiatrist, never personally examined Lila. Instead, he relied on medical records and interviews of those who had contact with her during the times in question. Manlove testified that Lila had the mental capacity

---

**4.** The evidence shows that Lila had renal dialysis from 10:50 a.m. to 1:50 p.m. on August 20, 1998, just shortly before she saw Dr. Brown. When she began renal dialysis that morning she was "alert, she was oriented, she was calm and she was cooperative." (Tello Depo 50). Following dialysis, when Dr. Brown chose to test Kramlich, she was tired and fatigued. Moreover, Dr. Tello testified that Kramlich's eyesight was tested on September 23, 1998, and it was determined that she had grade IV cataracts. The cataracts were advanced and present in both eyes. Cataracts do not advance quickly and thus, it can be inferred that Kramlich's eyesight on August 20, 1998, would have been almost the same as it was on September 23, 1998. In addition, Kramlich also suffered macular degeneration, which combined with the cataracts, would have made it very difficult for her to see well enough to read on August 20, 1998.

to legally execute her will and trust on July 14, 1998. Concluding that "medical capacity" is not the same as "legal capacity," the trial court accepted Manlove's opinion.

[¶ 26.] We cannot say that the court abused its discretion in accepting one opinion over another. Nor from the record evidence can we conclude that the trial court was clearly erroneous in finding that Lila was competent to execute her will and trust. Her handwritten instructions, made at a time when no one questions her competency, are consistent with her will and trust. It is not necessary that a person desiring to make a will have sufficient capacity to make contracts and do business generally or to engage in complex and intricate business matters. *Dokken,* 2000 SD 9 at ¶ 13, 604 N.W.2d at 491 (citing *Petterson v. Imbsen,* 46 S.D. 540, 546, 194 N.W. 842, 844 (1923)). From the time Lila executed her will and trust until her death, medical providers believed that Lila was competent to make medical decisions and to sign contracts concerning her care on several occasions.[5] Furthermore, Dr. Tello and the nurses testified that Lila's condition improved until her final discharge from the hospital, recognizing that she had her good and bad days, depending on whether she had dialysis.

[¶ 27.] Admittedly, the medical charts reflect that the nurses recorded that Lila was confused on certain days. But neither the nurses nor Dr. Tello could testify to Lila's condition between the hours of 1:00 p.m. and 2:00 p.m. on the afternoon of July 14, 1998. Lila obviously had moments of lucidity, even if she was confused at times. Harter was an eyewitness to the signing of the will and testified that Lila knew and understood the nature and extent of her assets and knew who her heirs were. Moreover, Harter testified that hospital policy was to consult a psychiatrist if there was a question of competency before the hospital would allow a patient to sign a power of attorney, will, or trust. Concluding that no such consultation was required, Harter arranged for another witness and a notary public to come to Lila's room where the will and trust were executed according to Gruenwald's written instructions. After a few telephone conversations with Lila on the morning of July 14, Gruenwald also believed that Lila was competent to execute a will and trust. Similarly, family and friends visiting Lila within days of July 14 opined that Lila was competent. Helen Kramlich and Doreen Schultz testified that Lila recognized them and was able to talk about family matters. Sieler also testified that Lila told her about the contents of her will and trust.

[¶ 28.] We acknowledge that some of the evidence on Lila's testamentary capacity is contradictory. However, it was for the trial court to examine the conflicting evidence and sort out the truth. *Dokken,* 2000 SD 9 at ¶ 25, 604 N.W.2d at 494; *Podgursky,* 271 N.W.2d at 56; *In re Williams' Estate,* 88 S.D. 55, 215 N.W.2d 489, 490 (1974). Witness credibility and

---

5. On July 13, 1998, Harter, on behalf of MedCenter One Hospital, and Kramlich both signed her application for admission to the assisted living center. On June 29, 1998, hospital personnel notarized Kramlich's signing of her durable power of attorney. On July 15, 1998, hospital personnel had Kramlich sign a release to give medical records to the assisted living center and a form for the classification level of therapeutic efforts. On August 20, 1998, the same day Dr. Brown evaluated Kramlich, medical personnel in renal dialysis at the hospital had Kramlich sign a release of medical information to be sent with her to the assisted living center. As late as January 12, 1999, Kramlich signed another form authorizing the release of her medical records to the Transport Life Insurance Company and authorized direct payment to the Q & R Clinic.

evidentiary weight are trial court determinations, and a reviewing court must accept that version of the evidence, including the inferences that can be fairly drawn therefrom, favorable to the trial court's findings. *Dokken,* 2000 SD 9 at ¶ 25, 604 N.W.2d at 494 (citations omitted). "Contestants of a will have the burden of establishing lack of testamentary intent or capacity, undue influence, fraud, duress, mistake, or revocation." SDCL 29A–3–407. There was sufficient evidence to justify the trial court's finding that Lila Kramlich possessed sufficient testamentary capacity to execute her will and trust. The contestants failed to meet their burden. The decision was not clearly erroneous.

[¶ 29.] Affirmed.

[¶ 30.] GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.